## ATLANTIC COAST LINE RAILROAD CO. *v.* BROTHERHOOD OF LOCOMOTIVE ENGINEERS ET AL.

No. 477.   Argued March 2–3, 1970—Decided June 8, 1970

282

*Dennis G. Lyons* and *Frank X. Friedmann, Jr.,* argued the cause for petitioner. With him on the briefs were *David M. Foster, John W. Weldon,* and *John S. Cox.*

*Allan Milledge* argued the cause for respondents. With him on the brief was *Richard L. Horn.*

MR. JUSTICE BLACK delivered the opinion of the Court.

Congress in 1793, shortly after the American Colonies became one united Nation, provided that in federal courts "a writ of injunction [shall not] be granted to stay proceedings in any court of a state." Act of March 2, 1793, § 5, 1 Stat. 335. Although certain exceptions to this general prohibition have been added, that statute, directing that state courts shall remain free from interference by federal courts, has remained in effect until this time. Today that amended statute provides:

> "A court of the United States may not grant an injunction to stay proceedings in a State court ex-

cept as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U. S. C. § 2283.

Despite the existence of this longstanding prohibition, in this case a federal court did enjoin the petitioner, Atlantic Coast Line Railroad Co. (ACL),[1] from invoking an injunction issued by a Florida state court which prohibited certain picketing by respondent Brotherhood of Locomotive Engineers (BLE). The case arose in the following way.

In 1967 BLE began picketing the Moncrief Yard, a switching yard located near Jacksonville, Florida, and wholly owned and operated by ACL.[2] As soon as this picketing began ACL went into federal court seeking an injunction. When the federal judge denied the request, ACL immediately went into state court and there succeeded in obtaining an injunction. No further legal action was taken in this dispute until two years later in 1969, after this Court's decision in *Brotherhood of Railroad Trainmen* v. *Jacksonville Terminal Co.*, 394

---

[1] After this suit was instituted ACL merged with the Seaboard Air Line Railroad Co. to form the present Seaboard Coast Line Railroad Co. We will continue, as have the parties, to refer to the petitioner as ACL.

[2] There is no present labor dispute between the ACL and the BLE or any other ACL employees. ACL became involved in this case as a result of a labor dispute between the Florida East Coast Railway Co. (FEC) and its employees. FEC cars are hauled into and out of Moncrief Yard and switched around to make up trains in that yard. The BLE picketed the yard, encouraging ACL employees not to handle any FEC cars.

The initial development of the controversy is chronicled in *Railway Clerks* v. *Florida E. C. R. Co.*, 384 U. S. 238 (1966). See also, *Railroad Trainmen* v. *Atlantic C. L. R. Co.*, 362 F. 2d 649 (C. A. 5th Cir.), aff'd by an equally divided court, 385 U. S. 20 (1966); *Florida E. C. R. Co.* v. *Railroad Trainmen*, 336 F. 2d 172 (C. A. 5th Cir. 1964).

U. S. 369 (1969). In that case the Court considered the validity of a state injunction against picketing by the BLE and other unions at the Jacksonville Terminal, located immediately next to Moncrief Yard. The Court reviewed the factual situation surrounding the Jacksonville Terminal picketing and concluded that the unions had a federally protected right to picket under the Railway Labor Act, 44 Stat. 577, as amended, 45 U. S. C. § 151 *et seq.,* and that that right could not be interfered with by state court injunctions. Immediately after a petition for rehearing was denied in that case, 394 U. S. 1024 (1969), the respondent BLE filed a motion in state court to dissolve the Moncrief Yard injunction, arguing that under the *Jacksonville Terminal* decision the injunction was improper. The state judge refused to dissolve the injunction, holding that this Court's *Jacksonville Terminal* decision was not controlling. The union did not elect to appeal that decision directly, but instead went back into the federal court and requested an injunction against the enforcement of the state court injunction. The District Judge granted the injunction and upon application a stay of that injunction, pending the filing and disposition of a petition for certiorari, was granted. 396 U. S. 1201 (1969). The Court of Appeals summarily affirmed on the parties' stipulation, and we granted a petition for certiorari to consider the validity of the federal court's injunction against the state court. 396 U. S. 901 (1969).

In this Court the union contends that the federal injunction was proper either "to protect or effectuate" the District Court's denial of an injunction in 1967, or as "necessary in aid of" the District Court's jurisdiction. Although the questions are by no means simple and clear, and the decision is difficult, we conclude that the injunction against the state court was not justified under either

of these two exceptions to the anti-injunction statute. We therefore hold that the federal injunction in this case was improper.

I

Before analyzing the specific legal arguments advanced in this case, we think it would be helpful to discuss the background and policy that led Congress to pass the anti-injunction statute in 1793. While all the reasons that led Congress to adopt this restriction on federal courts are not wholly clear,[3] it is certainly likely that one reason stemmed from the essentially federal nature of our national government. When this Nation was established by the Constitution, each State surrendered only a part of its sovereign power to the national government. But those powers that were not surrendered were retained by the States and unless a State was restrained by "the supreme Law of the Land" as expressed in the Constitution, laws, or treaties of the United States, it was free to exercise those retained powers as it saw fit. One of the reserved powers was the maintenance of state judicial systems for the decision of legal controversies. Many of the Framers of the Constitution felt that separate federal courts were unnecessary and that the state courts could be entrusted to protect both state and federal rights. Others felt that a complete system of federal courts to take care of federal legal problems should be provided for in the Constitution itself. This dispute resulted in compromise. One "supreme Court" was created by the Constitution, and Congress was given the power to create other federal courts. In the first Congress this power was exercised and a system of federal trial and appellate courts with limited jurisdiction was created by the Judiciary Act of 1789, 1 Stat. 73.

---

[3] See the historical discussion of the origin of the 1793 statute in *Toucey* v. *N. Y. Life Ins. Co.*, 314 U. S. 118, 129–132 (1941).

While the lower federal courts were given certain powers in the 1789 Act, they were not given any power to review directly cases from state courts, and they have not been given such powers since that time. Only the Supreme Court was authorized to review on direct appeal the decisions of state courts. Thus from the beginning we have had in this country two essentially separate legal systems. Each system proceeds independently of the other with ultimate review in this Court of the federal questions raised in either system. Understandably this dual court system was bound to lead to conflicts and frictions. Litigants who foresaw the possibility of more favorable treatment in one or the other system would predictably hasten to invoke the powers of whichever court it was believed would present the best chance of success. Obviously this dual system could not function if state and federal courts were free to fight each other for control of a particular case. Thus, in order to make the dual system work and "to prevent needless friction between state and federal courts," *Oklahoma Packing Co.* v. *Gas Co.*, 309 U. S. 4, 9 (1940), it was necessary to work out lines of demarcation between the two systems. Some of these limits were spelled out in the 1789 Act. Others have been added by later statutes as well as judicial decisions. The 1793 anti-injunction Act was at least in part a response to these pressures.

On its face the present Act is an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of three specifically defined exceptions. The respondents here have intimated that the Act only establishes a "principle of comity," not a binding rule on the power of the federal courts. The argument implies that in certain circumstances a federal court may enjoin state court proceedings even if that action cannot be justified by any of the three excep-

tions. We cannot accept any such contention. In 1955 when this Court interpreted this statute, it stated: "This is not a statute conveying a broad general policy for appropriate *ad hoc* application. Legislative policy is here expressed in a clear-cut prohibition qualified only by specifically defined exceptions." *Amalgamated Clothing Workers* v. *Richman Bros.*, 348 U. S. 511, 515–516 (1955). Since that time Congress has not seen fit to amend the statute and we therefore adhere to that position and hold that any injunction against state court proceedings otherwise proper under general equitable principles must be based on one of the specific statutory exceptions to § 2283 if it is to be upheld. Moreover since the statutory prohibition against such injunctions in part rests on the fundamental constitutional independence of the States and their courts, the exceptions should not be enlarged by loose statutory construction. Proceedings in state courts should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately this Court.

## II

In this case the Florida Circuit Court enjoined the union's intended picketing, and the United States District Court enjoined the railroad "from giving effect to or availing [itself] of the benefits of" that state court order. App. 196. Both sides agree that although this federal injunction is in terms directed only at the railroad it is an injunction "to stay proceedings in a State court." It is settled that the prohibition of § 2283 cannot be evaded by addressing the order to the parties or prohibiting utilization of the results of a completed state proceeding. *Oklahoma Packing Co.* v. *Gas Co.*, 309 U. S. 4, 9 (1940); *Hill* v. *Martin*, 296 U. S. 393, 403 (1935). Thus if the injunction against the Florida court

proceedings is to be upheld, it must be "expressly authorized by Act of Congress," "necessary in aid of [the District Court's] jurisdiction," or "to protect or effectuate [that court's] judgments."

Neither party argues that there is any express congressional authorization for injunctions in this situation and we agree with that conclusion. The respondent union does contend that the injunction was proper either as a means to protect or effectuate the District Court's 1967 order, or in aid of that court's jurisdiction. We do not think that either alleged basis can be supported.

## A

The argument based on protecting the 1967 order is not clearly expressed, but in essence it appears to run as follows: In 1967 the railroad sought a temporary restraining order which the union opposed. In the course of deciding that request, the United States District Court determined that the union had a federally protected right to picket Moncrief Yard and that this right could not be interfered with by state courts. When the Florida Circuit Court enjoined the picketing, the United States District Court could, in order to protect and effectuate its prior determination, enjoin enforcement of the state court injunction. Although the record on this point is not unambiguously clear, we conclude that no such interpretation of the 1967 order can be supported.

When the railroad initiated the federal suit it filed a complaint with three counts, each based entirely on alleged violations of federal law. The first two counts alleged violations of the Railway Labor Act, 45 U. S. C. § 151 *et seq.*, and the third alleged a violation of that Act and the Interstate Commerce Act as well. Each of the counts concluded with a prayer for an injunction against the picketing. Although the union had not been formally served with the complaint and had not filed an answer,

it appeared at a hearing on a motion for a temporary restraining order and argued against the issuance of such an order. The union argued that it was a party to a labor dispute with the FEC, that it had exhausted the administrative remedies required by the Railway Labor Act, and that it was thus free to engage in "self-help," or concerted economic activity. Then the union argued that such activity could not be enjoined by the federal court. In an attempt to clarify the basis of this argument the District Judge asked: "You are basing your case solely on the Norris-LaGuardia Act?" The union's lawyer replied: "Right. I think at this point of the argument, since Norris-LaGuardia is clearly in point here." App. 63. At no point during the entire argument did either side refer to state law, the effects of that law on the picketing, or the possible preclusion of state remedies as a result of overriding federal law. The next day the District Court entered an order denying the requested restraining order. In relevant part that order included these conclusions of law:

> "3. The parties to the BLE–FEC 'major dispute,' having exhausted the procedures of the Railway Labor Act, 45 U. S. C. § 151, et seq., are now free to engage in self-help. . . .
>
> "4. The conduct of the FEC pickets and that of the responding ACL employees are a part of the FEC–BLE major dispute. . . .
>
> .    .    .    .    .
>
> "7. The Norris-LaGuardia Act, 29 U. S. C. § 101, and the Clayton Act, 29 U. S. C. § 52, are applicable to the conduct of the defendants here involved." App. 67.

In this Court the union asserts that the determination that it was "free to engage in self-help" was a determination that it had a federally protected right to picket

and that state law could not be invoked to negate that right. The railroad, on the other hand, argues that the order merely determined that the *federal* court could not enjoin the picketing, in large part because of the general prohibition in the Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. § 101 *et seq.,* against issuance by federal courts of injunctions in labor disputes. Based solely on the state of the record when the order was entered, we are inclined to believe that the District Court did not determine whether federal law precluded an injunction based on state law. Not only was that point never argued to the court, but there is no language in the order that necessarily implies any decision on that question. In short we feel that the District Court in 1967 determined that federal law could not be invoked to enjoin the picketing at Moncrief Yard, and that the union did have a right "to engage in self-help" as far as the federal courts were concerned. But that decision is entirely different from a decision that the Railway Labor Act precludes state regulation of the picketing as well, and this latter decision is an essential prerequisite for upholding the 1969 injunction as necessary "to protect or effectuate" the 1967 order. Finally we think it highly unlikely that the brief statements in the order conceal a determination of a disputed legal point that later was to divide this Court in a 4-to-3 vote in *Jacksonville Terminal, supra,* in opinions totaling 28 pages. While judicial writing may sometimes be thought cryptic and tightly packed, the union's contention here stretches the content of the words well beyond the limits of reasonableness.

Any lingering doubts we might have as to the proper interpretation of the 1967 order are settled by references to the positions adopted by the parties later in the litigation. In response to the railroad's request for a temporary restraining order from the state court, the union

referred to the prior federal litigation, noted that it was part of a "major dispute," that it was covered by § 20 of the Clayton Act, 38 Stat. 738, 29 U. S. C. § 52 and that "[l]abor activity which is within the Clayton Act is 'immunized trade union activities.' *United States* v. *Hutcheson,* 312 U. S. 219, at pages 235–236." [4] 2 Record 105. At no point did the union appear to argue that the federal court had already determined that the railroad was precluded from obtaining an injunction under Florida law.

Similarly the union's arguments in 1969 indicate that the 1967 federal order did not determine whether federal law precluded resort to the state courts. When the union tried to dissolve the state court injunction, the argument was based entirely on the controlling effect of the *Jacksonville Terminal* decision on the picketing at Moncrief Yard. The union argued that this Court's "decision is squarely controlling upon [the Moncrief Yard] case which is identical in all material respects." 2 Record 123; see also *id.,* at 149–176. Although the union again mentioned that the federal District Judge had determined in 1967 that it was free to engage in self-help, it never argued that the 1967 order had in effect held with respect to Moncrief Yard what this Court later held was the law with respect to the Jacksonville Terminal situation. The railroad argued that *Jacksonville Terminal* was not controlling, and the Florida judge agreed.[5]

Our reading of this record is not altered by the District Court's 1969 opinion issued when the injunction

---

[4] The *Hutcheson* case held that protected union activity would not be deemed violative of federal antitrust law.

[5] For purposes of this case only, we will assume, without deciding, that the Florida Circuit Court's decision was wrong in light of our decision in *Jacksonville Terminal.*

was granted two years after the 1967 order was entered. In that opinion the court said:

"In its Order of April 26, 1967, this Court found that Plaintiff's Moncrief Yard, the area in question, 'is an integral and necessary part of [Florida East Coast Railway Company's] operations.'. . . The Court concluded furthermore that Defendants herein 'are now free to engage in self-help.'. . . The injunction of the state court, if allowed to continue in force, would effectively nullify this Court's findings and delineation of rights of the parties. The categorization of Defendants' activities as 'secondary' does not alter this state of affairs. See *Brotherhood of R. R. Trainmen* v. *Jacksonville Terminal Co.,* —— U. S. ——, 22 L. Ed. 2d 344 (1969). The prohibition of 28 U. S. C. § 2283, therefore, does not deprive this Court of jurisdiction to enter the injunction in this instance." App. 195–196.

We think the proper interpretation of that somewhat ambiguous passage can be reached only when it is considered in light of the arguments presented to the District Court by the union. In arguing that an injunction was necessary to protect the 1967 order, the union's lawyer said: "Now, the basic finding [of that order] is that we are free to engage in such self-help as is permitted under the Railway Labor Act. Now, Your Honor, at that point, did not get to the question of how broad is this right, because the Norris-LaGuardia Act prevented Your Honor from issuing an injunction. Now, how broad, then, is that right? We know, from the [*Jacksonville Terminal*] decision . . . ." 1 Record 249. The lawyer then proceeded to argue that the *Jacksonville Terminal* case had clearly revealed that the

right of self-help is beyond state court proscription in these circumstances. At no point during this hearing did the union try to argue, as it now appears to do, that the 1967 order itself had anticipated the *Jacksonville Terminal* decision. Rather the union appears to have argued that the decision of this Court in *Jacksonville Terminal* operated to define the scope of the right to self-help which the District Court had found the union entitled to exercise, and that the state court injunction interfered with that right as so defined. Considered in this light we cannot agree with the dissenting view in this case that the District Court in 1967 "by necessary implication" decided that the union had a federally protected right to picket that "could not be subverted by resort to state proceedings." *Post,* at 299. On the contrary, we read the quoted passage in the 1969 opinion as an indication that the District Court accepted the union's argument and concluded that the *Jacksonville Terminal* decision had amplified its 1967 order, and it was this amplification, rather than the original order itself, that required protection. Such a modification of an earlier order through an opinion in another case is not a "judgment" that can properly be protected by an injunction against state court proceedings.

This record, we think, conclusively shows that neither the parties themselves nor the District Court construed the 1967 order as the union now contends it should be construed. Rather we are convinced that the union in effect tried to get the Federal District Court to decide that the state court judge was wrong in distinguishing the *Jacksonville Terminal* decision. Such an attempt to seek appellate review of a state decision in the Federal District Court cannot be justified as necessary "to protect or effectuate" the 1967 order. The record simply will not support the union's contention on this point.

B

This brings us to the second prong of the union's argument in which it is suggested that even if the 1967 order did not determine the union's right to picket free from state interference, once the decision in *Jacksonville Terminal* was announced, the District Court was then free to enjoin the state court on the theory that such action was "necessary in aid of [the District Court's] jurisdiction." Again the argument is somewhat unclear, but it appears to go in this way: The District Court had acquired jurisdiction over the labor controversy in 1967 when the railroad filed its complaint, and it determined at that time that it did have jurisdiction. The dispute involved the legality of picketing by the union and the *Jacksonville Terminal* decision clearly indicated that such activity was not only legal, but was protected from state court interference. The state court had interfered with that right, and thus a federal injunction was "necessary in aid of its jurisdiction." For several reasons we cannot accept the contention.[6]

First, a federal court does not have inherent power to ignore the limitations of § 2283 and to enjoin state court proceedings merely because those proceedings interfere with a protected federal right or invade an area preempted by federal law, even when the interference is unmistakably clear. This rule applies regardless of whether the federal court itself has jurisdiction over the controversy, or whether it is ousted from jurisdiction for the

---

[6] The union also argues that the 1969 injunction was an aid to the federal court's jurisdiction in other pending cases arising out of this same labor dispute. This argument was not raised in the District Court and we need not consider it. In any event the reasons for rejecting the argument with respect to the 1967 order apply equally well to arguments relating to any other orders, cases, or judgments the union has advanced.

same reason that the state court is. Cf. *Amalgamated Clothing Workers* v. *Richman Bros., supra,* at 519–520. This conclusion is required because Congress itself set forth the only exceptions to the statute, and those exceptions do not include this situation. Second, if the District Court does have jurisdiction, it is not enough that the requested injunction is related to that jurisdiction, but it must be *"necessary in aid of"* that jurisdiction. While this language is admittedly broad, we conclude that it implies something similar to the concept of injunctions to "protect or effectuate" judgments. Both exceptions to the general prohibition of § 2283 imply that some federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case. Third, no such situation is presented here. Although the federal court did have jurisdiction of the railroad's complaint based on federal law, the state court also had jurisdiction over the complaint based on state law and the union's asserted federal defense as well. *Jacksonville Terminal, supra,* at 375–377, 390. While the railroad could probably have based its federal case on the pendent state law claims as well, *United Mine Workers* v. *Gibbs,* 383 U. S. 715 (1966), it was free to refrain from doing so and leave the state law questions and the related issue concerning preclusion of state remedies by federal law to the state courts. Conversely, although it could have tendered its federal claims to the state court, it was also free to restrict the state complaint to state grounds alone. Cf. *England* v. *Louisiana State Board of Medical Examiners,* 375 U. S. 411 (1964). In short, the state and federal courts had concurrent jurisdiction in this case, and neither court was free to prevent either party from simultaneously pursuing claims in both courts. *Kline* v.

*Burke Constr. Co.,* 260 U. S. 226 (1922); cf. *Donovan* v. *Dallas,* 377 U. S. 408 (1964). Therefore the state court's assumption of jurisdiction over the state law claims and the federal preclusion issue did not hinder the federal court's jurisdiction so as to make an injunction *necessary* to aid that jurisdiction. Nor was an injunction necessary because the state court may have taken action which the federal court was certain was improper under the *Jacksonville Terminal* decision. Again, lower federal courts possess no power whatever to sit in direct review of state court decisions. If the union was adversely affected by the state court's decision, it was free to seek vindication of its federal right in the Florida appellate courts and ultimately, if necessary, in this Court. Similarly if, because of the Florida Circuit Court's action, the union faced the threat of immediate irreparable injury sufficient to justify an injunction under usual equitable principles, it was undoubtedly free to seek such relief from the Florida appellate courts, and might possibly in certain emergency circumstances seek such relief from this Court as well. Cf. *Natural Gas Co.* v. *Public Serv. Comm'n,* 294 U. S. 698 (1935); *United States* v. *Moscow Fire Ins. Co.,* 308 U. S. 542 (1939); R. Robertson & F. Kirkham, Jurisdiction of the Supreme Court § 441 (R. Wolfson & P. Kurland ed. 1951). Unlike the Federal District Court, this Court does have potential appellate jurisdiction over federal questions raised in state court proceedings, and that broader jurisdiction allows this Court correspondingly broader authority to issue injunctions "necessary in aid of its jurisdiction."

### III

This case is by no means an easy one. The arguments in support of the union's contentions are not insubstantial. But whatever doubts we may have are strongly affected by the general prohibition of § 2283.

Any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy. The explicit wording of § 2283 itself implies as much, and the fundamental principle of a dual system of courts leads inevitably to that conclusion.

The injunction issued by the District Court must be vacated. Since that court has not yet proceeded to a final judgment in the case, the cause is remanded to it for further proceedings in conformity with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, concurring.

I join the Court's opinion on the understanding that its holding implies no retreat from *Brotherhood of Railroad Trainmen* v. *Jacksonville Terminal Co.,* 394 U. S. 369 (1969). Whether or not that case controls the underlying controversy here is a question that will arise only on review of any final judgment entered in the state court proceedings respecting that controversy.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE joins, dissenting.

My disagreement with the Court in this case is a relatively narrow one. I do not disagree with much that is said concerning the history and policies underlying 28 U. S. C. § 2283. Nor do I dispute the Court's holding on the basis of *Amalgamated Clothing Workers* v. *Richman Bros.,* 348 U. S. 511 (1955), that federal courts do not have authority to enjoin state proceedings merely because it is asserted that the state court is improperly asserting jurisdiction in an area pre-empted by federal

law or federal procedures. Nevertheless, in my view the District Court had discretion to enjoin the state proceedings in the present case because it acted pursuant to an explicit exception to the prohibition of § 2283, that is, "to protect or effectuate [the District Court's] judgments."

The pertinent portions of the District Court's 1967 order, denying ACL's application for injunctive relief and defining BLE's federally protected right to picket at the Moncrief Yard, are as follows:

"3. The parties to the BLE–FEC 'major dispute,' having exhausted the procedures of the Railway Labor Act, 45 U. S. C. § 151, et seq., are now free to engage in self-help. *Brotherhood of Locomotive Engineers* v. *Baltimore & O. R. R.*, 372 U. S. 284 (1963).

"4. The conduct of the FEC pickets and that of the responding ACL employees are a part of the FEC–BLE major dispute. *Brotherhood of Locomotive Firemen and Enginemen* v. *Florida East Coast Ry.*, 346 F. 2d 673 (5th Cir. 1965).

.        .        .        .        .

"6. The 'economic self-interest' of the picketing union in putting a stop to the interchange services daily performed within the premises of plaintiff's yard facilities, and in the normal, day-to-day operation of FEC trains operating with strike replacement crews within these facilities is present here. The 'economic self-interest' of the responding employees in refusing to handle this interchange and in making common cause with the striking FEC engineers is similarly present. *Brotherhood of R. R. Trainmen* v. *Atlantic Coast Line R. R.*, 362 F. 2d 649 (5th Cir.), *aff'd,* 385 U. S. 20 (1966).

"7. The Norris-LaGuardia Act, 29 U. S. C. § 101, and the Clayton Act, 29 U. S. C. § 52, are appli-

cable to the conduct of the defendants here involved. See *Brotherhood of Locomotive Firemen and Enginemen* v. *Florida East Coast Ry.*, 346 F. 2d 673 (5th Cir. 1965); *Brotherhood of R. R. Trainmen* v. *Atlantic Coast Line Railroad*, 362 F. 2d 649 (5th Cir.), *aff'd*, 385 U. S. 20 (1966)." App. 67–68.

The thrust of the District Judge's order is that the procedures prescribed by the Railway Labor Act had been exhausted in relation to the BLE–FEC dispute, that BLE was therefore free to engage in self-help tactics, and that it was properly exercising this federal right when it engaged in the picketing that ACL sought to enjoin. This interpretation of the order is supported by the fact that the District Judge relied upon *Brotherhood of Locomotive Engineers* v. *Baltimore & Ohio R. Co.*, 372 U. S. 284 (1963), in which this Court held that the parties had exhausted all available procedures under the Railway Labor Act and thus were free to resort to self-help. Furthermore, the District Court invoked § 20 of the Clayton Act, 29 U. S. C. § 52, which provides that certain union activities, including striking and peaceful picketing, shall not "be considered or held to be violations of any law of the United States." Thus, contrary to petitioner's contention, the District Court obviously decided considerably more than the threshold question of whether the Norris-LaGuardia Act withdrew jurisdiction to grant federal injunctive relief in the circumstances of this case.

In my view, what the District Court decided in 1967 was that BLE had a federally protected right to picket at the Moncrief Yard and, by necessary implication, that this right could not be subverted by resort to state proceedings. I find it difficult indeed to ascribe to the District Judge the views that the Court now says he held, namely, that ACL, merely by marching across the street to the state court, could render wholly nugatory the

District Judge's declaration that BLE had a federally protected right to strike at the Moncrief Yard.

Moreover, it is readily apparent from the District Court's 1969 order enjoining the state proceedings that the District Judge viewed his 1967 order as delineating the rights of the respective parties, and, more particularly, as establishing BLE's right to conduct the picketing in question under paramount federal law. This interpretation should be accepted as controlling, for certainly the District Judge is in the best position to render an authoritative interpretation of his own order. In the 1969 injunction order, after distinguishing *Richman Bros.* and concluding that the District Court could grant injunctive relief "in aid of its jurisdiction," the court alternatively held that it had power to stay the state court proceedings so as to effectuate its 1967 order:

> "In its Order of April 26, 1967, this Court found that Plaintiff's Moncrief Yard, the area in question, 'is an integral and necessary part of [Florida East Coast Railway Company's] operations.' . . . The Court concluded furthermore that Defendants herein 'are now free to engage in self-help.' . . . The injunction of the state court, if allowed to continue in force, would effectively nullify this Court's findings and delineation of rights of the parties. The categorization of Defendants' activities as 'secondary' does not alter this state of affairs. See *Brotherhood of R. R. Trainmen* v. *Jacksonville Terminal Co.*, — U. S. —, 22 L. Ed. 2d 344 (1969). The prohibition of 28 U. S. C. § 2283, therefore, does not deprive this Court of jurisdiction to enter the injunction in this instance. *Capital Service, Inc.* v. *NLRB,* 347 U. S. 501 (1954); [*United Indus. Workers of the Seafarers Int'l Union*] v. *Board of Trustees of Galveston Wharves,* 400 F. 2d 320 (5th Cir. 1968)." App. 195–196.

The District Judge's reliance upon *Capital Service, Inc. v. NLRB,* 347 U. S. 501 (1954),[1] and *United Indus. Workers of the Seafarers Int'l Union* v. *Board of Trustees of Galveston Wharves,* 400 F.. 2d 320 (C. A. 5th Cir. 1968), a fact ignored by the Court, is particularly significant, for both of these cases sustained injunctive relief against state court proceedings that threatened to impair the ability of the federal courts to make their judgments effective. Moreover, no matter how the arguments of counsel before the District Court are understood, it is apparent that the District Judge did not bottom the 1969 injunction upon our intervening decision in *Jacksonville Terminal* but merely cited that case to support the court's 1967 conclusion that the picketing in question constituted federally protected activity whether or not it had "secondary" aspects.

The Court seeks to bolster its own reading of the District Court's 1967 and 1969 orders by finding them "somewhat ambiguous" and then by referring to the arguments of counsel before that court and the state court both in 1967 and 1969. In the first place, it should be noted that the argument of counsel is not always a sure guide to the interpretation of a subsequent judicial decree or opinion, because it not infrequently happens, in this Court as well as others, that a decision is based on premises not elaborated by counsel. Indeed, occasionally a decision is grounded on a theory not even suggested by counsel's argument.

---

[1] In *Capital Service* the NLRB sought an injunction against certain picketing under § 10 (1) of the National Labor Relations Act, 29 U. S. C. § 160 (*l*). Previously a state court had restrained the very conduct that the District Court was asked to enjoin. This Court decided that the District Court had authority to enjoin the state proceedings so that it would have "unfettered power to decide for or against the union, and to write such decree as it deemed necessary in order to effectuate the policies of the Act." 347 U. S., at 505–506.

In any event, I believe that the Court has misinterpreted the argument of counsel in the lower courts. While I do not find the various proceedings below entirely free of confusion with respect to BLE's legal theory, there appear to be at least two strands to its argument. To be sure, BLE did contend, particularly in the state proceedings, that our decision in *Jacksonville Terminal* was controlling on the merits.[2] As I read the record, however, BLE also argued that the state injunction should either be dissolved or enjoined so that it would not interfere with the federal court's 1967 decree. Thus, in moving for a preliminary injunction against the state court proceedings, BLE relied both upon *Jacksonville Terminal* and upon the power of the District Court to issue the injunction "to protect and effectuate the judgment of this Court dated April 26, 1967." 1 Record 30–31.

Furthermore, both in support of the motion for a preliminary injunction and during oral argument in the District Court, BLE relied extensively upon *Capital Service, Inc.* v. *NLRB, supra,* and *United Indus. Workers of the Seafarers Int'l Union* v. *Board of Trustees of Galveston Wharves, supra.* See 1 Record 33–34, 243–245, 247, 253–257, 279–281. A consideration of the factual context of the latter case is instructive in understanding BLE's position below. In *Galveston Wharves*

---

[2] It is hardly surprising that BLE emphasized the *Jacksonville Terminal* decision in the state proceedings to dissolve the state injunction, and this reliance is hardly inconsistent with the position that the federal court in 1967 had authoritatively delineated BLE's federally protected right to strike at the Moncrief Yard. BLE may well have thought that its contention that *Jacksonville Terminal* was controlling on the issue of pre-emption would carry more weight with the state court than the alternative position that the protected character of the BLE picketing had been previously determined by the Federal District Court.

the union fully complied with the pertinent provisions of the Railway Labor Act, but, because the employer had refused to bargain concerning a "major" dispute, the union was free to strike. Meanwhile the employer obtained from a state court an injunction against any picketing on or near its premises. The Federal District Court ordered the parties to bargain and enjoined the employer from giving effect to, or seeking enforcement of, the state court injunction. The Court of Appeals for the Fifth Circuit affirmed the granting of injunctive relief on the ground that this action was within the § 2283 exception relating to the effectuation of federal court judgments. The Court of Appeals held that the union had a right to strike under the Railway Labor Act and that that right could not be frustrated or interfered with by state court injunctions. Similarly, BLE argued below that resort to state equitable proceedings should not be permitted to undermine the District Court's prior determination that BLE had a right to picket at the Moncrief Yard. As its injunction order indicates, the District Court was persuaded by BLE's argument. After the federal injunction was issued, in proceedings brought by ACL to stay the effectiveness of the order, BLE adhered to its position that the state injunction, if not enjoined, would nullify the District Court's 1967 order delineating the rights of the parties. 1 Record 499, 505, 508–509. Again BLE relied upon the intervening decision in *Jacksonville Terminal*, but it did so primarily in support of the contention that the 1967 order was proper insofar as it prohibited state court interference with the picketing at the Moncrief Yard. 1 Record 509–510. In essence, BLE argued that the 1967 order had correctly anticipated *Jacksonville Terminal*. See *ibid*.

In the state courts BLE adopted a position entirely consistent with the foregoing. For example, in opposing

ACL's application for a temporary injunction against the picketing, BLE contended that the District Court had previously held that under controlling federal law BLE's right to picket had been established, that this declaration of rights was *res judicata* in the state proceedings, and consequently that state proscription of the picketing was improper. 2 Record 104–105.

In sum, to the extent that the argument of counsel is an interpretive guide to what the District Court actually decided in its 1967 and 1969 orders, the Court's conclusion that the record "conclusively shows that neither the parties themselves nor the District Court construed the 1967 order" to preclude resort to state remedies to prohibit the Moncrief Yard picketing (*ante,* at 293) is wholly erroneous. And, quite apart from counsel's argument, it is apparent that the District Judge viewed his own 1967 order as delineating a federally protected right for the BLE picketing in question. Whether the District Court's anticipation of *Jacksonville Terminal* was correct in the circumstances of the present case is not now before us. But if the 1967 order is so understood, it is undeniably clear that the subsequent injunction against the state proceedings was both necessary and appropriate to preserve the integrity of the 1967 order.

In justifying its niggardly construction of the District Court's orders, the Court takes the position that any doubts concerning the propriety of an injunction against state proceedings should be resolved against the granting of injunctive relief. Unquestionably § 2283 manifests a general design on the part of Congress that federal courts not precipitately interfere with the orderly determination of controversies in state proceedings. However, this policy of nonintervention is by no means absolute, as the explicit exceptions in § 2283 make entirely clear. Thus, § 2283 itself evinces a congressional intent that

resort to state proceedings not be permitted to undermine a prior judgment of a federal court. But that is exactly what has occurred in the present case. Indeed, the federal determination that BLE may picket at the Moncrief Yard has been rendered wholly ineffective by the state injunction. The crippling restrictions that the Court today places upon the power of the District Court to effectuate and protect its orders are totally inconsistent with both the plain language of § 2283 and the policies underlying that statutory provision.

Accordingly, I would affirm the judgment of the Court of Appeals sustaining the District Court's grant of injunctive relief against petitioner's giving effect to, or availing itself of, the benefit of the state court injunction.