985 F.2d 459
 RICO Bus.Disp.Guide 8233
 EMPIRE BLUE CROSS AND BLUE SHIELD; Blue Cross and Blue
Shield of Connecticut, Inc., Plaintiffs-Appellees,
v.
JANET GREESON'S A PLACE FOR US, INC., Defendant,
Bellflower Doctors Hospital; Los Angeles Doctors
Corporation, dba Los Angeles Doctors Hospital,
Defendants-Appellants.
 No. 92-56272.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 6, 1993.
Decided Feb. 2, 1993.
 
 Irving H. Greines and Marc J. Poster, Greines, Martin, Stein & Richland, Beverly Hills, CA, and James P. Herzog and David R. Fisher, Herzog & Fisher, Marina del Rey, CA, for defendants-appellants Bellflower Doctors Hosp. and Los Angeles Doctors Corp.
 Dennett F. Kouri, William E. von Behren, and Joan L. Liguoro, Meserve, Mumper & Hughes, Los Angeles, CA, for plaintiffs-appellees Empire Blue Cross and Blue Shield and Blue Cross and Blue Shield of Connecticut, Inc.
 Appeal from the United States District Court for the Central District of California.
 Before: BROWNING, POOLE and NOONAN, Circuit Judges.
 NOONAN, Circuit Judge:
 
 
 1
 At issue is a preliminary injunction granted by a federal district court enjoining an arbitration ordered by a court of the state of California.
 
 
 2
 The suit for the injunction was brought by Empire Blue Cross and Blue Shield, a New York corporation, and Blue Cross and Blue Shield of Connecticut, Inc., a Connecticut corporation (the Insurers) against two Los Angeles hospitals, Bellflower Doctors Hospital and Los Angeles Doctors Hospital (the Hospitals) together with Janet Greeson's A Place For Us, Inc. (APFU), all California corporations. Jurisdiction is based on diversity of citizenship and on allegations made under RICO, 18 U.S.C. § 1961, et seq. Holding that grant of the injunction was in violation of the Anti-Injunction Act, 28 U.S.C. § 2283, we vacate the injunction.
 
 PROCEEDINGS
 
 3
 The relevant relationship between the Hospitals and the Insurers was created by a program designed by APFU. Under the program originated by Janet Greeson, the author of It's Not What You Are Eating, It's What's Eating You, the Hospitals provided in-patient psychiatric treatment for patients with a variety of psychiatric disorders, especially severe depression, often symptomatically expressed by a sharp increase or decrease in appetite. The subscribers to the plans of the two Insurers were flown to California to participate in this program at one or other of the Hospitals. The billing of the Hospitals was normally done for the Insurers by Blue Cross of California (BCC), the California member.
 
 
 4
 The Insurers and BCC were members of the Blue Cross and Blue Shield Association (Association), a separate not-for-profit Illinois membership corporation. Through the Association the Insurers facilitated the processing of the out-of-state claims by the Inter-Plan Service Bank, a clearing house for the transfer of funds between independent Blue Cross plans. BCC would pay the Hospitals and then expect reimbursement from the Insurers for their subscribers.
 
 
 5
 In 1991 the Insurers began to believe that the APFU program was a fraud and that what was presented as psychiatric treatment of severe depression was little more than a fat farm, a weight loss program without medical necessity or legitimacy. The Insurers refused to pay outstanding claims for the treatment.
 
 
 6
 The Hospitals had contracts with BCC which provided that in the event of a dispute over payment, there should be arbitration. Confronted by the Insurers' refusal to pay, the Hospitals invoked these contracts and on January 9, 1991 filed a demand for arbitration with the American Arbitration Association (AAA), naming approximately 40 Blue Cross plans throughout the country, including the Insurers, as respondents. The Insurers and other plans objected that they were not signatories to the contracts. On May 15, 1992 the Hospitals filed in the state court a Petition For Order Compelling Arbitration, naming only BCC as a respondent. The state court granted the petition on June 2, 1992, ordering that arbitration between the Hospitals and BCC before the AAA be completed by March 2, 1993.
 
 
 7
 On August 26, 1992 the Insurers moved in the federal district court against the Hospitals, bringing this suit alleging fraud and violation of RICO. They also sought a preliminary injunction to prevent their claims being submitted to the arbitration ordered by the state court.
 
 
 8
 On September 8, 1992 the district court granted the requested preliminary injunction and on September 24 issued findings of fact and conclusions of law in this regard. The court found that the Insurers were not signatories to the contracts between the Hospitals and BCC and that the Hospitals had presented no evidence to show that BCC was in fact the agent of the Insurers to bind them to arbitration of the claims. The court found as a matter of law that the Insurers had demonstrated a substantial likelihood of success on the merits of their suit for fraud and violations of RICO. The court further concluded as a matter of law that the Insurers would be "irreparably harmed" unless the injunction issued because they would be deprived of due process and trial by jury, would face the possibility of inconsistent results arising from the arbitration hearing and the federal suit, and would have to participate in multiple actions addressing the same or similar facts and issues raised in the federal suit. The injunction forbade the Hospitals from proceeding against the Insurers in the arbitration involving the Hospitals and BCC.
 
 
 9
 The Hospitals appeal.
 
 ANALYSIS
 
 10
 The Anti-Injunction Act is almost as old as the Constitution. An act of March 2, 1793 provided that in federal courts a writ of injunction should not "be granted to stay proceedings in any court of a state." 1 Stat. 335 (1793). The amended statute today provides, "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. As the Supreme Court has put it, "Legislative policy is here expressed in a clear-cut prohibition qualified only by specifically defined exceptions." Amalgamated Clothing Workers v. Richman Bros., 348 U.S. 511, 516, 75 S.Ct. 452, 455, 99 L.Ed. 600 (1955).
 
 
 11
 On the face of it, the preliminary injunction granted here was not expressly authorized by an Act of Congress, was not in aid of the jurisdiction of the district court and did not protect or effectuate a judgment of the district court. No express exception was invoked. No judgment of the district court existed which could either be protected or effectuated. Consequently, the injunction would appear to be in violation of the statute. Atlantic C.L.R. Co. v. Brotherhood of Engineers, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970).
 
 
 12
 However, like most statutes, this statute in the course of time has received a gloss--here a gloss as to what constitutes a proceeding in a state court. It has been authoritatively decided that the statute forbids the use of a federal injunction "to stay litigation in a state court" or, in other words, to interfere with the decision of a legal controversy in a state court. Roudebush v. Hartke, 405 U.S. 15, 20, 92 S.Ct. 804, 808, 31 L.Ed.2d 1 (1972). When an Indiana state court ordered a recount in an election for the United States Senate, it was held that the state court order was not the kind of state proceeding that the Anti-Injunction Act applied to. Id. at 21-23, 92 S.Ct. at 809. A judicial inquiry, it was noted, "investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist." Id. at 21, 92 S.Ct. at 809, quoting Prentis v. Atlantic C.L.R. Co., 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908). In the Indiana case an order for a recount could be secured by filing a timely petition in correct form with the superior court, upon which filing the state court was required to grant the petition, order the recount, and appoint three commissioners to carry it out; once the appointments were made the Indiana court had "no other responsibilities or powers." Roudebush, 405 U.S. at 21, 92 S.Ct. at 809. The duty of the state court was characterized "as ministerial, or perhaps administrative" but not as constituting a judicial proceeding. Id.
 
 
 13
 The question presented, then, is whether a California state court ordering arbitration is performing nothing more than an administrative or ministerial duty analogous to that performed in ordering a recount. Under California law an order compelling arbitration "is the final order in a special proceeding. Once the order is made, the special proceeding is complete and the arbitration must proceed. The order cannot be appealed or reviewed until after the arbitration is completed, and the trial court will not revisit the issue." Southeast Resource Recovery Facility Authority v. Montenay International Corp., 973 F.2d 711, 713 (9th Cir.1992). The litigation now in progress is not "in" any court of California. It is a proceeding before the AAA. So described, the arbitration order has a fair resemblance to the recount order described in Roudebush. However, the differences predominate.
 
 
 14
 First, the order to compel arbitration required the state court to do more than merely verify the form of a petition. The state court had to perform the quintessential judicial function of interpreting the contracts between the Hospitals and BCC in order to reach the conclusion that arbitration should be ordered. Second, upon the conclusion of the arbitration proceeding, a party to it may seek enforcement from the state court, and a party disagreeing with the order to arbitrate may obtain review of the order upon appeal from the trial court. Jones v. Kvistad, 19 Cal.App.3d 836, 97 Cal.Rptr. 100, 103 (1971). While the arbitration is proceeding, the state court may hold status conferences with the parties and may hold a party in contempt if it fails in its duty to participate in the arbitration proceeding. Cal.Civ.Proc.Code § 1209(5) (West 1982). The arbitration proceeding may be fairly described as ancillary to litigation begun and to be completed in a California court. In these several ways, the proceeding in the state court is one involving litigation, the decision of a legal controversy, and the enforcement of legal liability. That it is a "special proceeding" in no whit differentiates it from such obviously judicial proceedings as probate, also described in California as a "special proceeding." See e.g. Rooney v. Vermont Investment Corp., 10 Cal.3d 351, 110 Cal.Rptr. 353, 364, 515 P.2d 297, 306 (1973). Therefore, a federal court is without power to interrupt the proceedings by enjoining what the state court has commanded. Atlantic C.L.R. Co. v. Brotherhood of Engineers, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970).
 
 
 15
 If policy were needed as reinforcement of the statutory command, such justification exists. There is a healthy federal policy in favor of arbitration. Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). In line with that policy contracts are "generously construed" as to arbitrability. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985). The policy encourages private agreements to arbitrate, including, in particular, agreements to arbitrate under applicable state rules. Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford, Jr. University, 489 U.S. 468, 476, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488 (1989). In the light of this policy it would be anomalous to treat a state-ordered arbitration as open to interference by a federal court when the Anti-Injunction Act protects it.
 
 
 16
 The Injunction is VACATED.