**UNITED STATES of America, et al., Plaintiffs,**

v.

**REULAND ELECTRIC COMPANY, Defendant.**

No. CV 08–5618 ABC (FMOx).

United States District Court, C.D. California.

June 8, 2011.

Ann Rushton, Office of Attorney General of California, Los Angeles, CA, Elise S. Feldman, U.S. Department of Justice, Environmental Enforcement Section, San Francisco, CA, for Plaintiffs.

Robert L. Toms, Jr., Gibson Rivera & Toms LLP, Pasadena, CA, for Defendant.

## ORDER DENYING REULAND'S MOTION TO ENFORCE CONSENT DECREE AND ENJOIN NORTHROP GRUMMAN'S STATE COURT ACTION

AUDREY B. COLLINS, Chief Judge.

Pending before the Court is a Motion by Defendant Reuland Electric Company's ("Reuland") to Enforce Consent Decree and Enjoin Action ("Motion"), filed on May 16, 2011. On May 23, 2011, Plaintiff–in–Intervention Northrop Grumman Systems Incorporated ("Northrop Grumman") filed an Opposition, and the United States filed a Response and Declaration of Raymond Chivara in Support of Northrop Grumman's Opposition. On May 27, 2011, Reuland filed a Reply. The Court heard oral argument on June 6, 2011. Upon consideration of the materials submitted by the parties, argument of counsel, and the case file, the Court **DENIES** the Motion.

## I. BACKGROUND

Beginning in the 1980s, contaminants including volatile organic compounds ("VOCs") were found in the groundwater in the San Gabriel Basin. To effectuate clean-up under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq.[1], the Environmental Protection Agency ("EPA") investigated and

---

1. CERCLA may be cited by reference to its section number in title 42, or to its CERCLA-specific section. For example, 42 U.S.C. § 9601 is also CERCLA § 101. The Court will use both citations in its initial reference to a section, but thereafter will only refer to the CERCLA section.

identified dozens of entities that owned or operated facilities that may have contributed to the contamination in the so-called Puente Valley Operable Unit ("PVOU"). Among these Potentially Responsible Parties ("PRP") were Reuland and Northrop Grumman.

Eventually, the EPA and Reuland, after protracted negotiations, settled Reuland's CERCLA liability. Pursuant to this settlement, the EPA and the California Department of Toxic Substances Control ("DTSC") filed the Complaint in this action. Shortly thereafter, the parties filed a Consent Decree which this Court entered on October 27, 2008 *See* Consent Decree, Toms Decl., Exh. A ("Consent Decree"). In a related case, also involving the VOC contamination in the PVOU, Northrop Grumman entered into a consent decree with the EPA. *See* Toms Decl. Exh. B, Amended Consent Decree entered 08/21/2009 in *United States, et al. v. Northrop Grumman, et al.*, CV 09–866 ABC (FMOx). (The terms of the Northrop Grumman consent decree are not material to the resolution of this Motion.)

Parallel to the EPA's negotiations with PRPs over CERCLA liability, the San Gabriel Valley Water Company ("Water Company"), a private entity that supplies water to local residents, sought compensation from PRPs for damages it incurred from the impact the VOC contamination had on its ability to use water pumped from its B7 and B11 production wells. To ensure that the water it supplied would be code compliant, the Water Company in 1992 installed water treatment systems at B7 and B11 to remove VOCs from the water produced at these wells. (Toms Decl. Exh. C, State Court Complaint ¶ 49.) The Water Company sought compensation for the cost to install, operate, and maintain these systems. Northrop Grumman and the Water Company engaged in protracted settlement discussions in which

Northrop Grumman represented itself and approximately 30 other parties willing to settle with the Water Company; Reuland declined to participate. By November 2006, these Northrop Grumman–Water Company negotiations resulted in a settlement in which Northrop Grumman (and the other settling parties) agreed to pay $5,040,000 to satisfy the Water Company's damages that arose before September 1, 2004, and to pay to operate the Water Company's water treatment systems after that date until its wells are shut down. Northrop Grumman contends that it and the settling parties paid 100% of the liability and assumed the right to seek contribution from non-settling joint tortfeasors.

On November 18, 2009, Northrop Grumman filed a Complaint for Equitable Indemnity and Contribution in Los Angeles County Superior Court against a number of non-settling parties, including Reuland. *See Northrop Grumman v. A–1 Ornamental, Inc., et al.*, Case No. BC426, Superior Court of the State of California, Los Angeles County ("State Court Action"). *See* State Court Compl., Toms Decl. Exh. C ("State Court Complaint"). Therein, Northrop Grumman seeks contribution from those non-settling parties for their proportionate shares of the damages Northrop Grumman paid to the Water Company, and the costs it continues to incur to maintain appropriate water treatment systems ("Water Company liability"). (State Court Compl. ¶ 69.)

By this Motion, styled as seeking enforcement of its Consent Decree, Reuland asks the Court to enjoin Northrop Grumman's State Court Action for contribution. Specifically, Reuland argues that its Consent Decree with the EPA grants it contribution protection from Northrop Grumman's claims. Based on that protection, Reuland argues, this Court should now

enjoin the State Court Action, which has been pending since late 2009.

Northrop Grumman intervened to oppose the Motion, and does so on both procedural and substantive grounds. First, Northrop Grumman argues that none of the three exceptions to the Anti–Injunction Act, 28 U.S.C. § 2283, applies, and that therefore the Act bars this Court from enjoining the State Court Action. Substantively, Northrop Grumman contends that the Consent Decree does not and cannot grant Reuland contribution protection against Northrop Grumman's claims because the Water Company liability does not consist of "response costs."

## II. DISCUSSION

### A. Enjoining the State Court Action Would Not Be Appropriate.

The Anti–Injunction Act, 28 U.S.C. § 2283, bars federal courts from enjoining state court proceedings except in narrow circumstances:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

Reuland contends that an injunction is available to it under the second and third exceptions: to aid in this Court's exercise of its jurisdiction, and to effectuate its judgments. It is true, as Reuland notes, that the Court retained jurisdiction to enforce the Consent Decree. But this fact does not trigger the two exceptions Reuland relies upon.

■■■ The second and third exceptions are prefaced by the phrase "where necessary". In *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 295, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970), the Supreme Court explained that "[w]hile this language ['necessary in

aid of'] is admittedly broad, we conclude that it implies something similar to the concept of injunctions to 'protect or effectuate' judgments." *Atlantic Coast Line*, 398 U.S. at 295, 90 S.Ct. 1739. Thus, a state court proceeding may not be enjoined merely because it is related to a federal case, or because it interferes with a protected federal right, or because the state court is exercising jurisdiction concurrently with a federal court's jurisdiction. Instead, an injunction may be necessary only if it would "prevent a state court from so interfering with a federal court's consideration and disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Id.* Reuland has not explained why the state court's interpretation of the Consent Decree would so interfere with this Court's jurisdiction, or so threaten this Court's judgment, as to necessitate an injunction. Indeed, that Reuland is only now seeking to enjoin the State Court Action after litigating it since November 18, 2009 tends to belie any claim that an injunction is "necessary". The Court therefore **DENIES** Reuland's request that it enjoin the State Court Action.

### B. Reuland has Not Shown that the Water Company Liability is a "Matter Addressed" by the Consent Decree.

If an injunction is not available, Reuland asks the Court to afford alternative relief "by issuing an interpretation of the Consent Decree explaining that the Decree's 'Matters Addressed' include all costs at issue in the State Court Action, and that CERCLA settlements are not by law limited to CERCLA Response Costs." Reply 14:2–5. As phrased, this statement goes beyond what the Court needs to decide. Indeed, the Court need not make any general statements about the permissible scope of CERCLA settlements.

Instead, the Motion turns on the specific question of whether the Water Company liability for which Northrop Grumman is seeking contribution is the kind of liability for which the Consent Decree grants Reuland contribution protection. To resolve this question, the Court will look at the Consent Decree, its supporting papers, and the text of CERCLA itself. *See, e.g., Akzo Coatings, Inc. v. Aigner Corp.,* 30 F.3d 761, 766 (7th Cir.1994) (considering various factors to determine whether work is a "matter addressed," including the particular location, time frame, hazardous substances, and clean-up costs covered by the agreement, and stating that "Ultimately, the 'matters addressed' by a consent decree must be assessed in a manner consistent with both the reasonable expectations of the signatories and the equitable apportionment of costs that Congress has envisioned.")

The Consent Decree provides Reuland with contribution protection, as follows:

> The Parties agree that in consideration of the payment made by Settling Defendant [Reuland] and the execution of this Consent Decree, Settling Defendant has resolved its liability to Plaintiffs [the United States and the State of California] and is entitled to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), for Matters Addressed in this Consent Decree, conditioned only upon the entry of this Consent Decree.

Consent Decree ¶ 19. This provision is consistent with CERCLA, which provides: "A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement **shall not be liable for claims for contribution regarding matters addressed** in the settlement." 42 U.S.C. § 9613(f)(2), CERCLA § 113(f)(2) (emphasis added).

The Consent Decree defines "Matters Addressed" as "Response Work, Past Response Costs, Future Response Costs, Past DTSC Response Costs, and Future DTSC Response Costs." (Consent Decree ¶ 19.) Thus, Matters Addressed by the Consent Decree are Response Work and different categories of Response Costs: past and future, and incurred by the State of California or the United States and third parties. Given these definitions, the merits of the motion thus turn on whether the Water Company liabilities are "Response Work" or "Response Costs" as contemplated by the Consent Decree. The Consent Decree defines "Response Work" as "the design and implementation of any remedial measures, including the operation and maintenance thereof, encompassed within the Record of Decision ..." (Consent Decree ¶ 3(x)). As for the various Response Costs, regardless of when the costs were incurred or who incurred them, each category of Response Costs consists of "all costs including but not limited to Oversight Costs, direct and indirect costs, and Basin–Wide Response Costs, allocated to [or incurred at or relating to] the Site, including Interest." (Consent Decree ¶ 3(n), (o ), (t), (u).)

Reuland makes two alternative arguments as to why, based on these definitions, the Consent Decree grants it contribution protection from the Water Company liability. First, focusing on the clause "all costs" in the Consent Decree's definition of "Response Costs," Reuland urges the Court to find that "Response Costs" is, simply, "all costs", encompasses more costs than simply costs for CERCLA response work, and thus encompasses the Water Company liabilities. In the alternative, Reuland argues that the Water Company liabilities should be considered CERCLA response costs. The Court will address each argument in turn.

### 1. The Consent Decree Grants Reuland Contribution Protection Against CERCLA Response Costs Only.

■ The Consent Decree states, "Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA." (Consent Decree, introductory sentence to ¶ 3.) First, the Court notes that CERCLA does not define either "costs" or "response costs." As such, because CERCLA does not provide a definition, the Consent Decree necessarily had to establish its own definition for "Response Costs", which is set out above. Notably, however, the Consent Decree does not specifically define "response." CERCLA, by contrast, *does* define "response", which means "remove, removal, remedy, and remedial action." *See* 42 U.S.C. § 9601(25), CERCLA § 101(25). In turn, "remove" and "removal" mean, as relevant here, "the cleanup or removal of released hazardous substances from the environment." *See* 42 U.S.C. § 9601(23), CERCLA § 101(23) (emphasis added). "Remedy" or "remedial action" mean "those actions consistent with permanent remedy ... to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." (emphasis added) *See* 42 U.S.C. § 9601(24), CERCLA § 101(24).

It is clear that the Consent Decree's definition of "Response Costs" *relies* on CERCLA's definition of response, and merely identifies the various elements of costs that are involved in a CERCLA response. Specifically, the Consent Decree's definitions for "Response Costs" make clear that "Response Costs" include, for example, administrative costs (such as "oversight costs") arising out of the response, and not just costs for the immediate, on-site work of literally removing or remedying contamination. Quite the opposite of broadening CERCLA's definition of "response," the Consent Decree incorporates it by not establishing its own definition for that word. Thus, "Response Costs" here are the enumerated costs of a CERCLA response; this term *does not* encompass other costs that may have been incurred because of VOC contamination, but that did not arise out of a CERCLA response. The Court therefore rejects Reuland's contention, and finds that the Consent Decree grants it contribution protection against CERCLA response costs only.

The Court is not persuaded otherwise by Reuland's reference to an EPA 1997 Guidance Memo entitled "Defining 'Matters Addressed' in CERCLA Settlements." *See* Esterkin Decl. Exh. A., p. 6. In this memo, the EPA indicates that " 'matters addressed' may be broader [than the response actions or costs the settling parties agree to perform or pay] if the settlement is intended to resolve a wider range of response actions or costs, regardless of who undertakes the work or incurs those costs." Reuland's reliance on this statement is unavailing because even this "broader" possible scope of "matters addressed" is simply a "wider range of **response actions or costs.**" This Memo only reinforces the Court's conclusion that the Consent Decree grants contribution protection only as against CERCLA response costs. The Court expresses no opinion as to whether, in the abstract, a CERCLA settlement's "Matters Addressed" *may* encompass costs beyond CERCLA response costs; rather, the Court finds just that the Consent Decree here encompasses only CERCLA response costs.

## 2. The Water Company Liabilities Are Not CERCLA Response Costs.

The Court will now consider Reuland's alternative argument: that the Water Company liabilities are CERCLA response costs after all. In light of CERCLA's definitions of "response," "remedy" and "remove", set out above, the Court finds that, in general, the Water Company liabilities are not Response Costs. As Reuland points out, the Water Company liability was incurred in relation to two specific wells—B7 and B11—that are located within the Puente Valley Operable Unit, which is the Site. (*See* State Court Compl. ¶¶ 3, 49, 55; Consent Decree ¶ 3(z) (identifying "Site" as the PVOU).) It is also undisputed that the Water Company liability was incurred as a result of the contamination that also occasioned the Consent Decree. (*See* State Court Compl. ¶¶ 3, 55.) However, that the wells are located in the PVOU and that the contamination was the "but for" cause of the Water Company's need to install these treatment facilities does not render these liabilities Response Costs.

■ Although the precise nature of the work the Water Company undertook at its wells is not clear, both parties refer to it as the installation, operation, and maintenance of VOC treatment systems at the B7 and B11 production wells. *See, e.g.,* Reuland's Opening Brief 5:1–2; State Court Compl. ¶ 49, 55. The Water Company installed these systems so it could continue to provide safe drinking water to its customers. (State Court Compl. Exh. 1.) This does not appear to be a "removal" within the meaning of CERCLA because it is not "cleanup or removal … **from the environment**" (emphasis added); rather, these systems clean the water at the wells so it can be consumed by the public. Nor is it "remedial action" because it does not "prevent or minimize the release of hazardous substances so that they do not **migrate.**" (emphasis added.) As such, because the actions taken by the Water Company appear to be neither a "removal" nor a "remedial action," they are not a CERCLA "response". Therefore, the expenses incurred for these actions are not Response Costs, and are not, therefore, subsumed within Matters Addressed by the Consent Decree.

This view is further supported by the EPA's Interim Record of Decision ("IROD"), issued in September 1998. *See* IROD, Toms Decl. Exh. H. The IROD governs the EPA's remediation of the PVOU and, as such, informs any settlements EPA reached with PRPs, including the Reuland Consent Decree. *See also* Consent Decree ¶ 3(x) (defining "Response Work" as "the design and implementation of any remedial measures, including the operation and maintenance thereof, **encompassed within the Record of Decision …**") (emphasis added). In the IROD, the EPA described the four remediation options it considered for the PVOU, and explained why it selected the one it did. Notably, the EPA described its "selected remedy" as "**containment** of ground water contaminated with VOCs in the shallow and intermediate zones at the mouth of the Puente Valley to prevent further migration of existing ground-water contamination." (IROD p. iii) (emphasis added). The modification of the Water Company's drinking water production wells does not appear to be an action of "containment," and, therefore, was probably not the type of action the IROD contemplated as a CERCLA response, and, in turn, was not a Matter Addressed by the resulting Reuland Consent Decree.

Reuland also argues that the work it paid for through its Consent Decree will ultimately accrue to the Water Company's benefit because it will eventually reduce VOC contamination at the B7 and B11 wells. As such, Reuland contends, it has already been held responsible for and is

remedying the Water Company's damages and should not have to contribute further. This argument is not persuasive. As discussed above, the self-help measures the Water Company took were different in kind, purpose, and time from the EPA's Response Measures as described by the IROD. In fact, that the CERCLA response work Reuland is paying for may eventually, *but has not yet,* addressed the impact the VOC contamination has had on the Water Company's operations undermines Reuland's position.

The United States's Response in Support of Northrop Grumman's Opposition and the Declaration submitted with it reinforce this view. Therein, the EPA indicates that the Water Company began its wellhead treatment at B7 and B11 in 1992, six years before the EPA selected its remedy in 1998 through its IROD. Furthermore, as a practical matter, although the groundwater treatment plants could have been used as part of the EPA's remedy, they are not, in fact, being so used. Instead, a separate groundwater extraction and treatment system is being constructed to remediate groundwater. Thus, according to the EPA, although B7 and B11 "are within the geographic boundaries of the PVOU, these facilities and their associated well network are not part of the remedy for the Site." United States's Response, 2:26–3:2.

Notwithstanding the resolution of this Motion, the work underlying the Water Company liabilities is described only generally in the papers before the Court. It may be that certain elements of such work are Response Costs and may, therefore, be Matters Addressed for which Reuland arguably has contribution protection. But that question is now being litigated in the State Court Action wherein Reuland pleaded the Consent Decree and federal preemption as affirmative defenses. While this Court concludes that, generally, the Water Company liabilities do not appear to be Matters Addressed, the Court does not intend this finding to foreclose whatever more in-depth examination of specific components of that liability the state court may undertake. Such in-depth considerations were not raised in Reuland's Motion.

### III. CONCLUSION

Reuland's Consent Decree with the EPA settled Reuland's CERCLA liability and granted it contribution protection against additional CERCLA liability at the PVOU. The Consent Decree's "Matters Addressed" consist only of costs for CERCLA response work and do not encompass the damage the VOC contamination caused to the Water Company's production wells, or the water treatment systems the Water Company installed on those wells. Therefore, the Consent Decree does not provide Reuland with contribution protection from the Water Company liability. Reuland is not entitled to an injunction against Northrop Grumman's State Court Action. The Motion is therefore **DENIED.**

**SO ORDERED.**