885 F.Supp. 776 (1995)
In re TUTU WELLS CONTAMINATION LITIGATION.
Rhoda J. HARTHMAN, et al., Plaintiffs,
v.
TEXACO, INC., et al., Defendants.
ESSO STANDARD OIL, S.A., LTD., et al., Third-Party Plaintiffs,
v.
LAGA INDUSTRIES, LTD., et al., Third-Party Defendants.
FOUR WINDS PARTNERSHIP, Plaintiff,
v.
TEXACO CARIBBEAN, INC., et al., Defendants.
ESSO STANDARD OIL, S.A., LTD., Counter-claimant and Third-Party Plaintiff,
v.
LAGA INDUSTRIES, LTD., et al., Third-Party Defendants.
Master No. 1989-107. Civ. Nos. 89-220, 89-224.
District Court, Virgin Islands, Division of St. Thomas and St. John.
April 24, 1995.
*777 Richard R. Knoepfel, Briggs, Knoepfel & Ronca, Charlotte Amalie, St. Thomas, U.S. VI and Thomas H. Hart, III, Alkon, Rhea & Hart, Christiansted, St. Croix, U.S. VI, for PID-Harthmans.
John K. Dema, Carey-Anne Moody, Law Offices of John K. Dema, P.C., Christiansted, St. Croix, U.S. VI, and Darren Defoe, Waterford, ME, for Four Winds Plaza Partnership.
Addison J. Meyers, Mary Hoerber, Law Offices of O'Connor & Lemos, Coral Gables, FL and Edgar Christensen, Law Offices of R. Eric Moore, Christiansted, St. Croix, U.S. VI, for Texaco, Inc., Texaco Caribbean, Inc.
Robert T. Lehman, William J. O'Kane, Christopher Gibson, Archer & Greiner, Haddonfield, NJ and Douglas L. Capdeville, Christiansted, St. Croix VI, for Esso Standard Oil, S.A., Ltd., Esso Virgin Islands, Inc., and Esso Standard Oil, Co. (P.R.).
Kell M. Damsgaard, Morgan, Lewis & Bockius, Philadelphia, PA and Richard E. Daley, Law Offices of Pattie & Daley, Christiansted, St. Croix, U.S. VI, for Exxon Corp.
John A. Zebedee, Law Offices of James L. Hymes, Charlotte Amalie, St. Thomas, U.S. VI, for Vernon Morgan.
Francis E. Jackson, Jr., Charlotte Amalie, St. Thomas, U.S. VI, for Daniel Bayard.
Carol Ann Rich, Campbell, Arellano & Rich, Charlotte Amalie, St. Thomas, U.S. VI, for Ramsay Motors, Inc.
Nancy D'Anna, Cruz Bay, St. John, U.S. VI, and Patricio Martinez Lorenzo, Hato Rey, PR, for L'Henri, Inc.
Richard G. Leland, David Slossberg, Law Offices of Rosenman & Colin, New York City and Kevin A. Rames, Christiansted, St. Croix, U.S. VI, for Paul Lazare, Andreas Gal, The Duplan Corporation, Laga Industries, Ltd., Panex Industries, Inc., and Panex Co.
John R. Coon, Law Office of John R. Coon, Gallows Bay, St. Croix, U.S. VI, for Western Auto.
Ralda V. Simmonds, Charlotte Amalie, St. Thomas, U.S. VI, for Virgin Islands Housing Authority.
George Marshall Miller, Charlotte Amalie, St. Thomas, U.S. VI, for Thomas A. Gassett G.S. Industries, Inc.
Rosalie Simmonds Ballantine, Atty. Gen. for VI by Henry Thomas, Asst. Atty. Gen., Virgin Islands Dept. of Justice, Charlotte Amalie, St. Thomas, U.S. VI, for V.I. Dept. of Educ.
Katherine E. Harsch, Bornn, Bornn, Handy & Rashid, Charlotte Amalie, St. Thomas, U.S. VI, for Siegfried Torinus and Waltrad Torinus.

MEMORANDUM OPINION
BROTMAN, District Judge, Sitting by Designation.
This matter is before the court on the application of the Movants, the Esso Defendants, Ramsay Motors, Inc., Texaco Caribbean, Inc., Vernon Morgan and Western Auto for an Order enjoining Panex Industries, Inc., Paul Lazare, The Panex Industries, Inc. Shareholders Liquidating Trust (the "Trust") and the Trustees of the Panex Industries Inc. Shareholders Liquidating Trust from disbursing assets from the Trust, and from *778 proceeding with a Petition For Instruction Regarding Disbursement of Assets in the Chancery Court in Delaware. Because a stay is necessary to protect the judgments and orders this court has previously rendered, the motion to stay is granted.

INTRODUCTION
The underlying facts of this litigation were set forth in an Opinion dated August 13, 1993, published at 846 F.Supp. 1243 (D.V.I. 1993), (TUTU I) and supplemented in the Opinion of August 11, 1994 (TUTU II). Familiarity with the basic facts of this litigation is therefore presumed. An understanding of the issues requires a clear statement of the history, creation and dissolution of the corporate entities which now survive as the Panex Liquidating Trust. Because at the time the court rendered its opinion on the preliminary injunction discovery was incomplete as to the specific subject matter of this petition, the Panex Liquidating Trust[1], it is necessary to repeat and set forth in some detail the labyrinthian structure of the enterprises which are survived by the Liquidating Trust.

I. FACTS AND PROCEDURAL HISTORY

A. The Predecessor Corporations to the Panex Trust
Laga Industries, Ltd., ("Laga"), organized under Virgin Islands law, was engaged in the textile manufacturing business. Laga operated a textile manufacturing plant located in Estate Anna Retreat, St. Thomas, United States Virgin Islands. [The Laga site was identified by the Environmental Protection Agency ("EPA") as a potential source of the contamination to the Tutu aquifer at Estate Anna Retreat.] In 1970, Laga's initial shareholders and officers, Paul Lazare and Andreas Gal (hereinafter, "Lazare" and "Gal"), sold Laga to The Duplan Corporation ("Duplan"), a Delaware corporation. Lazare and Gal were retained as directors [and majority shareholders] of Duplan. As a result of the sale, Duplan owned one hundred percent (100%) of Laga's shares. See October 4, 1994 Deposition of Paul Lazare (hereinafter "Lazare Dep."). Laga was administratively "dissolved" in 1981 for failure to pay corporate franchise taxes.
On August 31, 1976, Duplan filed for Chapter XI reorganization. By Court Order dated October 5, 1976, Duplan's bankruptcy proceeding was converted into a Chapter X proceeding. In 1979, Duplan received authorization from the Bankruptcy Court to sell the Laga facility to Panex Co., a partnership composed of Lazare and Gal. Panex Co. later sold the property to the Government of the Virgin Islands, specifically the Department of Education. See Lazare Dep., pp. 31-32.
Duplan's Plan of Reorganization, and the Bankruptcy Court's Order of June 4, 1981, directed, among other matters, that Laga be dissolved.[2] The Plan further provided that holders of subordinated notes and debentures in Duplan were to receive new common stock in the successor corporation.[3] On July 11, 1981, Duplan was renamed Panex Industries, Inc. ("Panex").[4] Article VIII of the Restated Certificate provides that, to the extent authorized under Delaware Law, certain directors, officers and other identified persons could be indemnified by Panex.[5]
On September 18, 1981, the Board of Directors of Panex met and decided the following: that (1) 1,211,242 shares of Panex common stock would be issued to the holders of convertible subordinated debentures; that (2) Wundies, Inc. would be merged into Panex; (3) pursuant to § 9.1 of the Reorganization Plan, Lady Suzanne Foundation, Inc. *779 and Laga were to be dissolved. See Movants' Appendix, Exhibit "C-48." This Board meeting, as with subsequent meetings, was conducted by Daniel Rosenbloom, Chairman of the Board. See October 5, 1994 Deposition of Daniel Rosenbloom, p. 157, Movants' Appendix Exhibit "D," (hereinafter "Rosenbloom Dep.").
As a result of these reorganizations and dissolutions, Lazare and Gal became the owners of twenty seven percent (27%) of the common stock of Panex, See Appendix Exhibit C-6,[6] and Firmanco Associates became the owner of forty percent (40%) of Panex. Firmanco was a limited partnership in which First Manhattan Co. was the General Partner. First Manhattan Co. is a limited partnership of which Daniel Rosenbloom is a General Partner. Firmanco was formed to buy shares of stock in Panex Industries, Inc. from certain banks. Subsequently, Daniel Rosenbloom became Chairman of the Board of Panex and a trustee of the Panex Trust.[7]
A voting agreement required Lazare, Gal and Firmanco to vote together for the first two years following the emergence of Panex from the bankruptcy. See Lazare Dep., pp. 76-77, Appendix Exhibit C-39, p. 28. During subsequent meetings of the Board of Directors of Panex, the interests of the voting agreement were represented by the Directors present. Firmanco was represented by two general partners of First Manhattan Co., Daniel Rosenbloom and Arthur Zankel. See Movants' Appendix Exhibits C-2, 3, and 50.
Panex possessed two major assets: Rochester Button and Wundies, Inc.[8] On March 22, 1984, Panex sold the assets of Rochester Button to the Alpine Group ("Alpine"). However, under the terms of the agreement, the Wellsville facility, which the State of New York alleges sent hazardous substances to the Wellsville landfill, was specifically exempted from the assets purchased by Alpine.[9]
On July 26, 1984, after the sale of Rochester Button, the Panex Board of Directors[10] met to consider the adoption of a plan of complete liquidation for Panex. On August 9, 1984, a Liquidation Plan for Panex was presented to, and approved by, the Board. See Movants' Appendix Exhibit C-3, pp. 3-6. Pursuant to the Liquidation Plan, substantially all of the assets of Wundies, Inc. were to be sold. The plan also provided that the Panex Industries, Inc. Stockholders Liquidating Trust ("Panex Trust") was to be formed to satisfy the contingent liabilities of *780 Panex.[11] The Panex Trust was to be initially funded with $6 million reserved from the funds received from the liquidation.[12]

1. Creation of the Panex Liquidating Trust
On August 31, 1984, a Proxy Statement describing the Liquidation Plan was distributed to all shareholders of Panex. See Movants' Appendix Exhibit C-6. The Proxy Statement unambiguously disclosed that:
IT IS POSSIBLE THAT THE AMOUNT HELD IN TRUST TO COVER CONTINGENT AND OTHER LIABILITIES OF PANEX WILL BE USED TO DISCHARGE SUCH LIABILITIES ... MOREOVER, ALTHOUGH THE BOARD OF DIRECTORS BELIEVES THAT THE AMOUNT OF APPROXIMATELY $6 MILLION WHICH WILL BE DEPOSITED IN THE LIQUIDATING TRUST WILL BE SUFFICIENT TO COVER ANY LIABILITIES WHICH MAY ARISE DURING OR AFTER THE LIQUIDATING PERIOD, THERE CAN BE NO ASSURANCE THAT THIS WILL BE THE CASE. IF THE AMOUNT HELD IN THE LIQUIDATING TRUST IS INSUFFICIENT TO DISCHARGE FULLY ALL LIABILITIES WHICH MAY ARISE, OR IF LIABILITIES ARISE AFTER THE TRUST IS TERMINATED, EACH PANEX STOCKHOLDER MAY BE LIABLE FOR ANY UNPAID PORTION OF SUCH LIABILITIES TO THE EXTENT OF THE LIQUIDATING DISTRIBUTIONS PAID TO HIM, INCLUDING, IF APPLICABLE, THE VALUE OF ANY WUNDIES STOCK WHICH HE MAY RECEIVE AS A LIQUIDATING DISTRIBUTION.
As of September 30, 1984, Panex, after making a 1982 tender offer to its shareholders, had 1,844,202 outstanding shares of common stock. See Movants' Appendix Exhibit C-40, pp. S-3 and S-11. As of October 3, 1983 the G/L Group, comprised of the family interests of Gal and Lazare, held 511,721 shares, or 27.8%, of Panex; See Appendix Exhibit C-39, p. 39-FN2. Firmanco held 722,802 shares and First Manhattan Co., for itself, owned 17,530 shares. See Appendix Exhibit C-39, p. 37. (For the convenience of the reader the amounts received in the liquidation of Panex based upon the above percentage of ownership have been reproduced in a chart, infra at p. 781).
The shareholders of Panex received three cash liquidation distributions. The first distribution of $6.00 per share occurred on September 21, 1984. The second distribution of $16.00 per share occurred on December 12, 1984.[13] On April 15, 1985, the Certificate of Dissolution of Panex, which had been adopted on September 24, 1984, was filed with the Delaware Secretary of State. See Movants' Appendix Exhibit C-31.
On April 30, 1985 the Panex Board of Directors met and approved an Asset Purchase Agreement negotiated by Rosenbloom (for which First Manhattan Co. received a $500,000.00 fee)[14] to sell substantially all of the assets of Wundies, Inc. to Wundies Industries, Inc.[15] Wundies, Inc. was ultimately *781 sold for $44,320,000.00 in cash and 2,375,000 shares of preferred, and 276,105 shares of common stock in Wundies Industries, Inc.[16]
After the sale, the third and final distribution of Panex's assets, including the proceeds of the Wundies, Inc. sale, was made to the shareholders of Panex. See Movants' Appendix Exhibit C-18. The shareholders received $23.00 per share, as well as one share of preferred stock, and .15 shares of common stock, in Wundies Industries, Inc. for each share held in Panex. See Lazare Dep., pp. 62 and 82. The funds received by the Lazare and Gal families were deposited into an account with Neuberger and Berman, to which their Panex common stock had been transferred on August 15, 1985. See Movants' Appendix Exhibit C-11, 12, 13, 14 and 14A. The Lazare account remains open today. See Lazare Dep., p. 100. In addition to the funds received by First Manhattan Co. for its own account, it continues to hold the preferred stock of Wundies Industries, Inc. See Rosenbloom Dep., p. 62.
On September 12, 1985, the Panex Trust was formed with an initial balance of $6 million.[17]
On July 10, 1987, the Panex Trust distributed to its beneficial interest holders (the former Panex shareholders), $3.00 per unit.[18] Thereafter, the Panex Trust held a principal balance of $1,150,000.00.[19]
To date, the records disclose the following total distributions from Panex and the Panex Trust to the four major shareholder groups of Panex:[20]

 Trust
 1st Distribution 2nd Distribution 3rd Distribution Distribution
SHAREHOLDER 9/25/84 12/31/84 9/12/85 7/10/85 Total
Gal & Family $1,466,508 $ 3,910,688 $ 5,621,614 $ 733,255 $11,732,064
Lazare & Family $1,467,114 $ 3,912,304 $ 5,623,937 $ 733,557 $11,736,912
Firmanco
"Group"/First
Manhattan Co. $4,441,140 $11,846,240 $17,027,636 $2,220,996 $35,536,012
Goldman Sachs $1,217,172 $ 3,412,944 $ 4,665,826 $ 616,986 $ 9,912,928

By letter dated March 16, 1988 from the New York Department of Environmental Conservation ("DEC"), the Trustees of the Panex Trust received notice that Panex was considered a potentially responsible party ("PRP"), because of Rochester Button's alleged contamination of the Wellsville-And-over landfill.[21] An additional letter concerning the contamination at the Wellsville facility was sent by DEC on August 8, 1988.
*782 Counsel for the Panex Trust responded on May 25, 1988 that Rochester Button had been sold to Alpine, that the former Wellsville facility had been sold to a Walter Babbitt, and that "Panex is no longer in existence."[22] There was no mention of the existence of the Panex Trust created to satisfy the contingent liabilities of Panex.[23] However, in response to the foregoing letters, the Panex Trust delayed final distribution of trust assets.
The Panex Trust has been paying the costs of defense for the Laga Defendants in the instant litigation.[24] Until recently, the Panex Trust also paid the defense costs associated with the Wellsville landfill. At this point, the assets of the Panex Trust are insufficient to satisfy its existing liabilities. The trust corpus is approximately $1,100,000.00.
The trustees have recognized a number of claims against the dwindling corpus of the Trust. Those claims include, but are not limited to (1) approximately $500,000.00 owed to Arthur D. Little, the Laga Defendants' expert, and (2) several hundred thousand dollars in legal fees. Additionally, the Panex Trust seeks to pay approximately $600,000.00 to satisfy the Laga Defendants' settlement obligations to Four Winds.[25] The aggregate *783 of these liabilities recognized by the trustees exceeds the Trusts' corpus. Though the Trust provides that each beneficiary may be liable for any unpaid portion of any liabilities to the extent of liquidation distributions paid to such beneficiary by the Company and the Trust,[26] the Trustees have manifested no intent to seek reimbursement from Trust distributees to satisfy these obligations, or to satisfy any other liabilities of Panex which exceed the current Trust corpus.[27] Nonetheless, the Laga Defendants contend that the court should look to "the terms of the Trust and to the common law in effect prior to enactment of § 281(b), [8 Del.Gen.Corp.Law.] to determine the trustees' obligation."

B. The Delaware Petition
The Laga Defendants contend that the purpose for the Petition before the Delaware Chancery Court is to obtain a much needed ruling with respect to the assets of the Trust "which could be binding on all of the various claimants to the Trust's assets." See Laga Defendant's Brief, p. 22. That is, the Laga Defendants aver that the Petition to the Delaware Court is merely to obtain "a determination as to the proper distribution of the trust assets under Delaware law."

II. DISCUSSION
Movants argue that the potential for substantial interference with this court's management of the instant case exists if the Laga Defendants are allowed to proceed with the later filed Delaware action to distribute the current assets of the Trust. They argue that the Trust is structured to terminate once all its assets have been exhausted; and that the petition before the Delaware Court is but an attempt to terminate the Trust and cut off all claims against the Laga Defendants and the Trust (the surviving entity of the dissolved Panex Industries, Inc.). Moreover, Movants argue that though the Trust provides that each beneficiary may be liable for any unpaid portion of any liabilities to the extent of liquidation distributions paid to such beneficiary by the Company and the Trust, the Trustees have made no attempt to seek reimbursement from Trust distributees to satisfy the present obligations of the Trust, or to satisfy any other liabilities of Panex which exceed the current Trust corpus. Therefore, Movants contend that since depletion of the identifiable assets of the Trust may result in its civil death, the stay should issue both as necessary in aid of the court's jurisdiction and to effectuate the Orders and Judgments of this court.
Respondents counter that the petition before the Delaware Court is merely to obtain a much needed ruling to resolve the priority of the several competing claims against the limited Trust assets. Respondents claim first that the Delaware Chancery Court has exclusive jurisdiction over all the parties with claims against the Liquidating Trusts. As such, only a ruling from the Delaware Court would be binding on all parties with claims *784 against the Trust Assets. Second, Respondents question this court's authority to issue an Order that would be binding against all parties with claims against the Trust. Specifically, Respondents point to the suit by New York State and its objection to the payment of the Four Winds settlement from the corpus of the Trust on the ground that Delaware Law requires a ratable distribution of the Trust assets. Third, Respondents argue that a ruling from the Delaware court is necessary to direct the Trustees as to how to proceed with respect to these competing claims against the Trust, therefore a stay of the Delaware action would be improper and highly prejudicial. In addition, Respondents attack this court's assertion of jurisdiction over the Trust and Trustee, contending that the Panex Trust has never been named in the pleadings and has never been served in the Tutu Wells litigation. Moreover, Respondents contend that the recent ruling by the Third Circuit Court of Appeals in Witco v. Beekhuis, 38 F.3d 682 (3d Cir.1994) compels dismissal of the claims against Panex and the other Laga Defendants, and therefore moots the concerns which prompted the court to issue a preliminary injunction. It follows then, Respondents contend, that the motion for a permanent injunction must be denied.

A. Application of WITCO
As a preliminary matter, this court must address Respondents' contention that application of the Third Circuit's recent decision in Witco compels a finding that the CERCLA claims against the Laga Defendants are time-barred and must therefore be dismissed.
The court disagrees with this broad reading of Witco. Stripped to its essence, Witco stands for the simple proposition that "state capacity statutes, ..., are not preempted under CERCLA." Specifically, the court in Witco held that "`the capacity of a Corporation to sue and be sued is to be determined by the law under which it is organized.'" Witco, 38 F.3d at 690, citing with approval United States v. Northeastern Pharmaceutical & Chemical Co., 810 F.2d 726, 746, cert. denied, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987). This court determined in its August 11, 1994 Opinion that under Delaware Law, the Panex Liquidating Trust, as long as it remains in existence, extends the winding-up period of the dissolved corporation. The Delaware Courts have held that a liquidating trust establishes a separate legal entity, though the trust is "formed to wind up the predecessor corporation affairs [and] `operates in the same manner as a dissolving corporation.'" City Investing Company Liquidating Trust v. Continental Cas. Co., 624 A.2d 1191, 1197 (Del. 1993), citing In re Tru Block Concrete Products Inc., 27 B.R. 486, 489 (Bkrtcy.S.D.Cal. 1983). As that court goes on to explain, a liquidating trust "`is, in effect, the alter ego of the predecessor corporation.'" Id.
Moreover, the Delaware Court in City Investing explained further that:
Since the liquidating trust is a separate entity, but not a corporation, (it is a simple trust), it is not subject to the three-year period imposed by § 278. However, because it holds assets for the benefit of both the shareholders and creditors under the plan of liquidation, it is subject to creditor claims.
City Investing, 624 A.2d at 1197. In other words, because of the existence and activities of the Liquidating Trust, the predecessor corporation, has the attributes of a corporation in dissolution, with the capacity to sue and be sued.
Thus, applying Delaware Law as mandated by Witco, the court reaffirms its prior holding that the Panex Liquidating Trust extended the winding-up period of Panex Industries, Inc., the predecessor corporation. Therefore, the claims filed against the predecessor corporation during this extended dissolution period are not time barred. This holding merely mirrors the Delaware Supreme Court's decision in City Investing which stated that, if as here, a liquidating trust, is in existence at the time a claim is filed, the Trust cannot "restrict its liability to claims filed within three years of dissolution of the predecessor corporation." 624 A.2d at 1197. Accordingly, Respondents' contention that the CERCLA claims against [Panex, *785 Inc. and] the Panex Trust are time-barred and therefore should be dismissed, is rejected.

B. Jurisdiction Over the Trust and Trustees

1. Application of City Investing
Respondents maintain that the court lacks personal jurisdiction over the Trust and the Trustee Rosenbloom. Respondents' first contention is that this court in its August 11, 1994 Opinion, misconstrued City Investing. Respondents argue that while "refusing to dismiss the claims against the liquidating trust (which had been named in the pleadings), [the court in City Investing] affirmed the dismissal of the complaint against the dissolved corporate predecessor entity." It is Respondents who have misconstrued this court's ruling in its August 11, 1994 Opinion.
First, the holding of City Investing on this point is not as clear as Respondents would suggest, but ambiguous. In City Investing the Delaware Supreme Court stated that the appeal will
address the question of whether a dissolved corporation, which established a liquidating trust to administer its assets during a post-dissolution period, is subject to a claim asserted beyond the three-year period established under § 278 of the General Corporation Law. The court of Chancery determined that the claim is not timebarred and was assertable under the terms of the agreement which established the Trust. We agree....
624 A.2d at 1191. The Delaware Supreme Court ultimately affirmed the Chancery court which had ruled that the corporation was not subject to suit, but held that the trust which was still in existence was liable for the contingent claims of the predecessor corporation. Its analysis, like that of this court in the August 11 decision, focused on the terms of the trust agreement, and the law of trusts in determining capacity and liability for the contingent claims against the corporation.
Second, in its August 11, 1994 Opinion, this court also noted that the Common Law and § 279 of Del.Gen.Corp.Law allowed for the prosecution and defense of an action in the name of the corporation by a trustee. See In re Tutu Water Wells Litigation II, 157 F.R.D. 367, 374 (D.V.I.1994). This court also looked to the Trust agreement which requires affirmative consent by a majority of the trustees for all actions to be taken. Here, this court remarked that the Trust, through the actions taken by its trustees, has appeared in and has been defending this suit for the predecessor corporation. Moreover, § 278 of Del.Gen.Corp.Law does not operate as an act of limitation on the prosecution of claims by and against trustees in the name of the corporation under § 279 and where a liquidating trust is in existence.
Here, a liquidating trust exists and operates as the predecessor corporation in dissolution. It can no longer be disputed that the Liquidating Trust is the successor entity of Panex Inc. in that it acceded to the assets and liabilities of Panex Inc. The question of whether in personam jurisdiction exist in this forum as to Panex Inc. was decided by this court in its 1993 TUTU I decision. Thus an exercise of in personam jurisdiction over the Panex liquidating Trust (the alter ego entity of Panex Inc.) does not offend traditional notions of fair play and substantial justice. The Liquidating Trust, established as it was to implement the corporate dissolution of Panex, could reasonably anticipate being haled into this court to answer for the torts of its predecessor corporation. That is, personal jurisdiction over the trust may be based on the contacts with the forum by its predecessor corporation. Accord Rollins Environmental Services, Inc. v. Wright, 738 F.Supp. 150 (D.Del.1990).
Respondents maintain, nonetheless, that this court does not have jurisdiction over the Trustee Rosenbloom in his capacity as trustee of the Liquidating Trust. It can no longer be disputed that the claims against the corporation are in fact and law claims against the Liquidating Trust which acceded to the assets of the dissolved corporation. Accepting as true Respondents' first argument that the dissolved corporation does not exist independent of the Liquidating Trust, it follows that all action taken in this litigation in the name of the corporation was taken by *786 the Trust, the only entity, under Respondents' theory, that legally could take such actions. For example, Panex Industries Inc. raised cross-claims in this proceeding and filed, in this court, a Third Party Complaint on behalf of the Panex Liquidating Trust against Panex Inc.'s insurers. Clearly these acts may be taken as consent to the jurisdiction of this court by the Trust and its trustees. Since it is axiomatic that a trust acts only through its trustees, and this Trust defended and prosecuted claims in this proceeding in the name of the dissolved corporation, the court may conclude that the Trustee Rosenbloom voluntarily appeared in this proceeding in his specific capacity as trustee. On this basis, the court may conclude that because of the activities undertaken by the Liquidating Trust for the dissolved Delaware Corporation through the Trustees, including the objecting trustee by necessary consent, (recall the Trust acts by unanimous decision of the trustees) both the Trust and the Trustees may be said to have appeared voluntarily in this proceeding. This conclusion comports with the settled rule that personal jurisdiction over a party may be based on the party's voluntary appearance in the forum or consent to the jurisdiction. Moreover, nothing in these facts would support an argument by the Trustee Rosenbloom that he has been unaware of this litigation, or that the strictures of the due process clause of Article XIV of the United States Constitution have not been met. In addition, as this court noted in its August 11, 1994 Opinion basic trust principles support this contention.[28] Moreover, it is well established that the affirmative defense of lack of personal jurisdiction, unlike subject matter jurisdiction, may be waived. It has been shown that Rosenbloom took actions in this proceeding in his capacity as trustee and, in effect, consented to the jurisdiction of this court. Since the defense of lack of personal jurisdiction over him as a trustee was not raised affirmatively prior to appearing in this action, it is waived. For all these reasons, the court rests on its prior conclusion that there is "no procedural or constitutional impediment to an assertion of jurisdiction by this court over the [Trust], or Lazare and Rosenbloom, in their capacity as trustees."

2. Jurisdiction to Issue The Injunction
Respondents also challenge this court's jurisdiction to issue the injunction under the first-filed rule. In its prior opinion on this issue the court relied on the first-filed rule as an additional basis to enjoin the proceeding in Delaware court. Respondents devoted several pages of argument attacking the court's secondary reliance on this doctrine to support its issuance of the TRO. Inasmuch as the court supported the issuance of the TRO as proper and necessary to protect and effectuate its Orders and Settlement, as it is empowered to do under the Anti-Injunction Act and the All-Writs, it will eschew further discussion of the applicability of the first-filed rule in this proceeding.
The court must decide whether the facts of this petition, as developed, support the issuance of an order enjoining the Delaware action permanently. The Anti-Injunction Act prohibits federal courts from enjoining state court proceedings unless the injunction falls within one of three specifically defined exceptions. Atlantic Coast Line R. Co. v. Brotherhood of Loc. Eng., 398 U.S. 281, 286-7, 90 S.Ct. 1739, 1743, 26 L.Ed.2d 234 (1970). The exercise of this narrowly circumscribed authority to stay a state court proceeding is never to be taken lightly since it impinges on the "fundamental constitutional independence of the States and their courts." Atlantic Coast Line., 398 U.S. at 287, 90 S.Ct. at 1743.
The closely related All-Writs Act also empowers a federal court in similar terms to "issue all writs necessary or appropriate in aid of [its] jurisdiction and agreeable to the usages and principles of law." 28 U.S.C. § 1651, The court makes a clarification to one comment in its August 11, 1994 Opinion on the construction of the "necessary in aid of" language of these two Acts. In the Anti-Injunction *787 Act context, the "necessary in aid of" language, though admittedly broad, is always strictly construed. See Atlantic Coast, 398 U.S. at 294, 90 S.Ct. at 1747. Indeed, the Supreme Court has stressed repeatedly that the Anti-Injunction Act imposes a flat and absolute prohibition and allows only three exceptions, which are "`not [to] be enlarged by loose statutory construction.'" Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 146, 108 S.Ct. 1684, 1689, 100 L.Ed.2d 127 (1988), quoting Atlantic Coast Line R. Co. v. Locomotive Engineers, 398 U.S. at 287, 90 S.Ct. at 1743, citing Amalgamated Clothing Workers v. Richman Brothers Co., 348 U.S. 511, 514, 75 S.Ct. 452, 454-55, 99 L.Ed. 600 (1955). In its earlier opinion granting Movants' petition for a preliminary injunction, this court concluded that a temporary stay was necessary to preserve and maintain its jurisdiction over the Laga Defendants and to avoid the substantial risk of serious impairment of its prior judgments in this matter and/or the settlement negotiations reached and ongoing in the primary action. The question now is whether a permanent injunction should issue.

C. The Permanent Injunction
Movants' primary argument for the issuance of the injunction in this action is the protection and effectuation of the Fourth Case Management Order ("Fourth CMO") entered by this court on September 23, 1993. They contend that the action in the Delaware Court, if allowed to proceed, will impair the court's authority to administer justice in the main litigation. Specifically, Movants argue the court's management of the main litigation as established by the Fourth CMO is in serious jeopardy. This is so because under the Fourth CMO, negotiated and agreed to by all parties, including the Laga Defendants, all Third and Fourth Party claims pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") and/or the Resource Conservation and Recovery Act ("RCRA") were severed and stayed. All discovery as to liability under these claims was also stayed. The Laga Defendants have been identified as potentially responsible parties ("PRPs") by the Environmental Potential Agency ("EPA"). Movants point out that civilly, with respect to the right to sue and be sued, the corporate entities comprising the Laga Defendants are on life-support. Movants further contend that "to permit the Panex Trust to proceed in Delaware and potentially terminate because its current liabilities exceed its assets, and because the interested parties, (Rosenbloom and Lazare), [the Trustees] refuse to recoup any monies from the distributees of the Panex Trust" will in effect extinguish the sole discernable sign of civil life of these potentially responsible parties, and cut off their ability to assert their claims for contribution against Panex Inc.
Movants' second argument for the issuance of the injunction is that the District Court of the Virgin Islands is the most appropriate forum to determine all CERCLA issues affecting the Panex Trust. First, Movants contend that resolving all these issues in this court will eliminate the possibility of inconsistent determinations. Movants next argue that because Congress vested exclusive jurisdiction under CERCLA in the federal courts to resolve claims arising thereunder, it is consistent with principles of comity for this court to assert jurisdiction over all issues relating to the Panex Trust and the CERCLA claims.
In supporting these claims Movants point out that according to the scheduling order issued by the Delaware court:
[a]ny creditor or claimant of the Trust or the Company, or any other interested person, may appear in person or by attorney at the hearing and be heard and present evidence from material that may be proper or relevant to the issues to be heard and determined at the hearing; provided, however, that no such person other than the trustees, their attorneys, or witnesses called by the trustees shall be heard, and no evidence, writings or other materials submitted by any person other than the trustees and their attorneys shall be received or considered by the court unless ... written notice of an intention to appear, as well as a copy of all writings, or other materials which the person desires to receive or to consider, shall be filed.
*788 The clear language of this scheduling order, Movants contend, would require Texaco, Esso and L'Henri, as well as any other interested party, to file a proof of claim with all supporting evidence or potentially risk losing these claims. Assuming that the Laga Defendants will contest these claims for response costs, the Movants will have to establish, in a Delaware Chancery Court, their prima facie case of CERCLA liability against the Laga Defendants, as well as the amount of their response costs.
Such an outcome is directly contrary to this Court's management of this complex litigation and the CERCLA claims severed in the instant case, and to Congress' grant of exclusive jurisdiction to federal courts over CERCLA claims. The Movants claim that they have not conducted the discovery necessary to establish their prima facie case of liability against all of the Laga Defendants, including the former officers and directors of these entities, Gal and Lazare. Experts have not been retained to provide opinions regarding the consistency of their response costs with the National Contingency Plan because this aspect of the case was stayed pursuant to the Fourth CMO. However, if the Delaware proceeding is not enjoined, Movants, and other parties subject to the Fourth CMO, would be faced with the Hobson's choice of either forfeiting their CERCLA claims for liability against the Panex Trust, or litigating the merits of their claims against the Panex Trust in the Delaware Chancery Court, without critical evidence to support their claim of liability.
The argument goes, that the prejudice inherent in requiring the Movants, and other parties severed under the Fourth CMO, to litigate these CERCLA issues in Delaware is readily apparent. First, there is the decided probability of an adverse ruling. Second, because the Delaware court is without jurisdiction to pass on the CERCLA issues, Movants would be forced to later litigate those issues in the Virgin Islands, resulting in a tremendous waste of judicial resources in Delaware and the Virgin Islands, as well as a waste of the limited resources of some of the parties, including the Virgin Islands Government. Movants contend, it is bad enough to litigate a multiparty CERCLA action once; but to litigate such an action twice is unconscionable.
Finally, Movants argue that though the Delaware Chancery Court may be one of several appropriate forums to determine construction of the Trust Agreement, it is without authority to resolve the CERCLA claims of the Movants in the instant case. In the present forum, there is no statutory or constitutional impediment to prevent the federal district court from resolving the contract issues raised in the Delaware petition. However, the same cannot be said of the Delaware Court with respect to the issue of CERCLA liability, since jurisdiction over CERCLA matters is exclusive in federal courts. Moreover, Movants point out, that Respondents, the Laga Defendants and the Panex Trust, moved in this court to resolve an insurance coverage dispute with respect to the Panex Trust, claiming, at the time, that the court's familiarity with the extensive record and the parties made it the best forum. As such, the court should not be persuaded by this subsequent contention that Delaware is the only appropriate forum to resolve all other issues regarding the Panex Trust.
Respondents counter that if Panex could properly be sued under CERCLA as of the date the action was commenced against it, then under Delaware law the action will not abate at the expiration of the three-year dissolution period, but rather "be continued as a body corporate beyond the three-year period and until any judgments, orders or decrees therein shall be fully executed." Del.Gen.Corp.Law. § 278. Therefore, Respondents argue:
there is no reason for this court to be concerned that if the Delaware Vice Chancellor allows the Trust's assets to be expended for litigation expenses or applied to the Four Winds settlement and as a result, the Trust assets are totally used up, that this would have any impact over this court's jurisdiction.
Laga Defendants' Brief at 69.
Next, the Laga Defendants and the Panex Trust argue that "there is no basis for Movants apparent contention that the Trustees *789 can recapture monies distributed to the shareholders of Panex in 1984 and 1985 or to the beneficial owners of the trust in 1987, years before any CERCLA claim was brought against Panex and the other Laga Defendants." Laga Defendants' Brief at 71. The Laga Defendants claim that Witco, City of Philadelphia v. Stepan Chemical Co., 713 F.Supp. 1491 (E.D.Pa.1989) (cited with approval in Witco), and AM Properties Corp. v. GTE Products Corp., 844 F.Supp. 1007 (D.N.J.1994) all support this contention. The Laga Defendants also contend that because the CERCLA claims are "unliquidated" and have "not been reduced to judgment against the corporate entity" these claims are not valid claims against the assets of the dissolved entity. See Laga Defendants' Brief at 72-73.
The court will address this last argument made by the Laga Defendants first. The Laga defendants contend that Witco undercuts the theory of recapture or recoupment because there the court held that "assets which Beekhuis [the deceased PRP] had put into trust [though] easily findable did not allow the untimely CERCLA claim to be maintained." The fallacious premise of this argument is readily exposed and dispelled. As the court has pointed out, the relevant thrust of Witco, bearing on this litigation, is that State capacity statutes are not preempted by CERCLA and that courts must look to state law to determine the civil capacity of the corporate entity. Here, the court has shown that under Delaware Law, a liquidating trust, the Panex Trust, extends the winding-up period of the corporation. Therefore, the three-year dissolution period of § 278, Del.Gen.Corp.Law, does not prevent the assertion of a claim for corporate liability during the life of the liquidating trust. Under Delaware law then, a liquidating trust which holds the assets of the corporation is subject to claims that "mature" or are raised during the existence of the Trust. City Investing Liquidating, 624 A.2d at 1197. Thus, Witco does not compel dismissal of the claims, as the Laga Defendants contend.
In addition, the Laga Defendants' reliance on Stepan Chemical and AM Properties for the contention of non-liability of the Trust is also misplaced. In Stepan Chemical, the court analyzed the recapture theory under Pennsylvania law. That court found that no exception to the Pennsylvania rule of nonliability applied to the transfer of assets from the company to the Trust to hold the trust liable as the successor-in-interest of the corporation for the corporate tort. Absent application of an exception, that court also looked to the trust agreement to determine liability. The Stepan court found "no evidence that the trustees ever agreed  either expressly or impliedly  to assume the obligations of Eastern States [the predecessor corporation]." Stepan Chemical, 713 F.Supp. at 1495. The court in Stepan then concluded that the trust at issue could not be held liable under CERCLA for the corporate tort.
Here, not only does Delaware law regard the liquidating trust, as the "alter-ego" of the predecessor corporation, but it imposes liability on that separate legal entity for the obligations of the corporation whose assets it administers. See City Investing, 624 A.2d at 1197. Moreover, in this case, unlike Stepan Chemical, the Trust agreement provided for the payment or "satisf[action] [of] any and all liabilities of Panex which are not paid or otherwise discharged." Trust Agreement at ¶ 3.1 and 4.1(i). For similar reasons, the Laga Defendants reliance on Am Properties is also misplaced. There, not only was the corporation dissolved, but the liquidating trust itself had terminated and final distributions had been made almost four (4) years before the CERCLA action was filed. Clearly, the holdings of these cases do not control, since as the court has shown, the facts of these cases are readily distinguishable from the facts presented in this suit.
Furthermore, the possibility of recapture or recoupment in the present matter was disclosed to Panex's shareholders at the time they received the liquidating distributions from the corporation, and the distribution from the assets of the Liquidating Trust. The proxy statement sent to Panex's shareholders regarding the dissolution of the corporation disclosed:
It is possible that the entire amount which will be held in the Liquidating *790 Trust to cover contingent and other liabilities of Panex will be used to discharge such liabilities.... [A]lthough the Board of Directors believes that the amount of approximately $6 million which will be deposited in the Liquidating Trust will be sufficient to cover any liabilities which may arise during or after the Liquidation Period, there can be no assurance that this will be the case. If the amount held in the Liquidating Trust is insufficient to discharge fully all liabilities which arise after the Liquidating Trust is terminated, each Panex stockholder may be liable for any unpaid portion of such liabilities to the extent of the liquidating distributions paid to him, including, if applicable, the value of Wundies stock which he may receive as a liquidating distribution.

(Bold type in original, second emphasis ours). A similar disclosure was made in a financial report, dated December 31, 1991, prepared by an independent auditing firm for the shareholders of Panex. See Movants' Appendix, Exhibit C. These disclosures indicate knowledge and awareness by the shareholders of Panex of the potential for the recapture of assets for the liabilities of the corporation, and belie Respondents' contention that the recoupment theory has no support in fact or law.
The Laga Defendants' remaining arguments are related, and will be addressed together. They first argue that even if the Delaware Petition results in the termination of the Trust, this fact would not interfere with the court's jurisdiction over the Laga Defendants in this matter, provided the claims are not time-barred. The Laga Defendants then argue that even if the claims are not time-barred, they are not valid against the trust because they have not been reduced to judgment. For support of this argument the Laga Defendants point to § 325(b), of Del.Gen.Corp.Law, which provides:
No suit shall be brought against any officer, director or stockholder for any debt of a corporation of which he is an officer, director or stockholder until judgment be obtained therefor against the corporation and execution thereon returned unsatisfied.

Accordingly, the Laga Defendants argue that "`nonjudgment contract creditor has no present real claim' in assets of dissolved entity." Brief of Laga Defendants at p. 72. Disposition of this argument requires no lengthy discussion, since it is plain from the above quoted language that § 325(b) speaks to claims asserted against directors or officers, and does not apply to prohibit the claims asserted in this case against the corporation, and its successor entity, the Liquidating Trust. Thus, § 325(b) does not apply to render invalid the "unliquidated CERCLA claims of Movants" as the Laga Defendants contend.
Next, the court looks to the Laga Defendants' related argument that a judgment by the Delaware court "allow[ing] the Trust's assets to be expended ... and as a result, the Trust assets are totally used up, would have [no] impact over this court's jurisdiction." In addressing this argument the court must place it in context of the factual posture of this case. In the Fourth CMO this court ordered that all CERCLA and RCRA claims "which have heretofore been or may be asserted by any party to these actions ... are hereby severed from the within action and stayed." However, though under Delaware law the dissolution period of a corporation is extended through the life of a liquidating trust, and as such the liquidating trust is subject to claims filed against the corporation beyond the three-year period imposed by § 278, Del.Gen.Corp.Law, City Investing suggests and the Trust agreement provides that the Trust terminates upon dissipation of its assets, thus ending the civil life of the corporation. Given this factual and legal context, it cannot seriously be argued that a decision by the Delaware court, which Respondents admit could result in the exhaustion of the Trust's assets, would have no serious impact on the parties to this litigation and this court's jurisdiction and control of this case, since termination of the Trust may effectively terminate the claims stayed against the corporation.
Respondents further contend that Movants are not precluded from presenting proof of *791 their claims against the Trust before the Delaware Court and that neither the Trust nor the Trustees have ever been named formally in this action and therefore the court's assertion of jurisdiction over the Trust or the Trustee Rosenbloom is questionable at best. First, the court rejected the latter part of this contention supra, reaffirming its earlier assertion of jurisdiction over the Trust and the Trustee Rosenbloom. Second, it is clear that the parties can hardly present proof of claims which have been stayed, without running afoul of this court's mandate. Moreover, Respondents' position that under Delaware law all potential claimants to the assets of the Trust would be given the opportunity to submit papers and to appear, would force the parties, whose claims are stayed in this litigation, to submit the question of Panex Inc.'s, and consequently the Trust's liability under CERCLA to a court that has no authority to determine these claims.
Respondents acknowledge that the Delaware proceeding is not simply one for judicial instructions as to the payment of claims, but that a judgment by the Delaware court may result in total exhaustion of the Trust assets and termination of the Trust. It is also clear that a real consequence of such a judgment is the preclusion of meritorious claims that have been stayed by order of this court. As such it cannot be disputed that the Delaware action, if allowed to proceed, would not only frustrate this court's prior judgments, but would so interfere with this court's consideration or disposition of the issues presented in this litigation as to seriously impair this court's flexibility and authority to decide the issues presented. See Atlantic Coast Line, 398 U.S. at 295, 90 S.Ct. at 1747. Equity requires at the very least that the current proceeding be stayed and that the Movants be allowed to seek relief from the stay imposed by the Fourth CMO to assert their claims against Respondents and the Trust.
As a final note, the court observes that this is not a trust that holds an interest in land that would be subject to situs jurisdiction in the state in which the interests are located. Here, as the court has noted the "minimum contacts" of the predecessor corporation with this forum are imputed to the Liquidating Trust which holds the assets of that corporation and was established to carry out the dissolution of the predecessor corporation. There is no impediment to this court's exercise of personal jurisdiction over the Trust or the Trustees. Where, as here, the trust res is intangible property, i.e. bank accounts, jurisdiction over the debtor is generally "sufficient to give the forum court jurisdiction to adjudicate any controversy involving the intangible." See Generally, Trust & Conflict of Laws Problems, § 292, p. 240.
For the reasons stated above the motion for a permanent injunction is GRANTED.
ORDER ENJOINING THE LAGA DEFENDANTS, AND THE TRUSTEES OF THE PANEX INDUSTRIES, INC. STOCKHOLDERS LIQUIDATING TRUST, FROM PROCEEDING WITH PETITION BEFORE THE DELAWARE CHANCERY COURT ACTION CAPTIONED IN RE PANEX INDUSTRIES, INC. STOCKHOLDERS LIQUIDATING TRUST, C.A. NO. 13584
THIS MATTER having come before the Court on the application of the Movants, the Esso defendants, Ramsay Motors, Inc., Texaco Caribbean, Inc., Vernon Morgan and Western Auto for an Order enjoining Panex Industries, Inc., Paul Lazare, The Panex Industries, Inc. Shareholders Liquidating Trust and the Trustees of the Panex Industries, Inc. Shareholders Liquidating Trust from disbursing assets from the Trust and from proceeding with a Petition for Instruction Regarding Disbursement of Assets in the Chancery Court in Delaware; the Court having reviewed the moving papers and heard the arguments of counsel, and in accordance with the accompanying Memorandum Opinion filed herewith;
IT IS on this 20th day of April, 1995, ORDERED that:
1. Panex Industries, Inc., Paul Lazare, The Panex Industries, Inc. Shareholders Liquidating Trust and the Trustees of the Panex Industries, Inc. Shareholders Liquidating Trust, Paul Lazare and Daniel Rosenbloom, are hereby enjoined from disbursing assets from the Trust and from proceeding before *792 the Court of Chancery of the State of Delaware, In and For New Castle County, in the matter captioned In Re: Panex Industries, Inc. Stockholders' Liquidating Trust, C.A. 13584, until further order of this Court.
2. Panex Industries, Inc., Paul Lazare, The Panex Industries, Inc. Shareholders Liquidating Trust and the Trustees of the Panex Industries, Inc. Shareholders Liquidating Trust, Paul Lazare and Daniel Rosenbloom, shall cause to be sent by Express Mail, a copy of this Order and Memorandum Opinion to the Court of Chancery of the State of Delaware, In and For New Castle County. This mailing must be completed by May 15, 1995.
NOTES
[1] In its August 11, 1994 ruling the court granted the Movants leave to conduct expedited discovery as to the creation of the Trust and its remaining assets.
[2] See Exhibit "B" to the Movants' Appendix, Affidavit of Joseph Zuckerman (hereinafter "Zuckerman Affidavit") dated July 5, 1994, filed in the U.S. District Court Western District of New York, in Case No. 94-CV-0400E(H), The State of New York, et al. v. Panex Industries, Inc., et al., at Exhibit "A" thereto, pp. B-4, B-15 at Article IX, and B-18.
[3] Zuckerman Affidavit and Exhibit "A" thereto, page B-12, Article V.
[4] Zuckerman Affidavit and Exhibit "J" thereto, p. 2.
[5] Zuckerman Affidavit and Exhibit "J" thereto, p. 4.
[6] As a result of the bankruptcy proceedings, Paul Lazare acquired 204, 187 shares of Panex. Nicki Lazare, Paul Lazare's daughter, acquired 32,770 shares. Phillip Roth, Lazare's stepson acquired 7,562 shares. Further, Andreas Gal acquired 112,126 shares. His wife, Susan Gal acquired 112,126 shares and his daughter, Julia Gal acquired 20,166 shares. Appendix Exhibits C-11, 12, 13, 14, 14A and 15.
[7] Appendix Exhibit C-50, Rosenbloom Dep., p. 134; Rosenbloom Dep., p. 136. During the deposition, Rosenbloom refused to disclose the partners in Firmanco. Rosenbloom Dep., pp. 145-149. In addition to 722,802 shares held by Firmanco, First Manhattan Co. held for itself 17,530 of Panex shares. Exhibit C-6, p. 8.
[8] Wundies, Inc., a New York corporation, was originally owned by Duplan and was a profit making operation during the bankruptcy proceedings. In 1981, Duplan merged its subsidiaries known as Gold Coast and Kickaway, Corp., also profitable corporations involved in the manufacture of ladies clothing, into Wundies. The new corporation was known as Wundies, Inc., a Delaware Corporation.
[9] By letter dated May 2, 1988, Alpine notified Paul Lazare that it had received notice from the New York Department of Environmental Conservation that Rochester Button was a potentially responsible party for contamination of the Wellsville landfill. Further, Alpine asserted that it was entitled to indemnification for liability associated with the site since this property was specifically exempted from the purchase of the corporate assets by Alpine.
[10] Rosenbloom asserts that the President of Rochester Button, Arthur Rosenthal, was not a director in Panex Industries, Inc. Rosenbloom Dep., p. 156, lines 18-19. Panex's 1983 annual report states otherwise. Appendix Exhibit C-39, pp. 26-27. There he is listed with other Directors. Mr. Rosenthal was the President of Rochester Button and as disclosed in documents previously produced by the Laga Defendants, was aware as of October 27, 1980, of Rochester Button's "current hazardous waste disposal problem," see Movant's Appendix Exhibit "E."
[11] Lazare and Rosenbloom denied knowledge of any environmental problem prior to receiving a final notice from the State of New York in 1988. Lazare Dep., pp. 118-119. When Rosenbloom became aware of the New York claim, he "(t)hought it was no claim. I thought it was against Panex Industries, which was going out of business." Rosenbloom Dep., p. 119. Purportedly, it was a claim against Panex but not a liability to be satisfied by the Panex Shareholders Liquidating Trust. Id. at 123-124. New York was never notified of the existence of the Trust because "the trust was not a party to anything the DEC had to be involved with in my judgment." Rosenbloom Dep., pp. 125-126.
[12] Appendix Exhibit C-6, pp. 4-6.
[13] The amounts distributed to Gal, Lazare and Firmanco interests are reflected in Appendix Exhibits C-7, 8, 9 and 10.
[14] Rosenbloom Dep., pp. 172-73; Appendix Exhibit C-32.
[15] The Agreement is attached as Exhibit A to the June 28, 1985 Proxy Statement, Appendix Exhibit C-33, submitted to Panex shareholders. Paul Lazare described the transaction as being a leveraged buy out, where "the participants were the officers and interested parties of Wundies ..." Lazare Dep., p. 49. Mr. Rosenbloom was uncertain whether the transaction was a leveraged buy out. Rosenbloom Dep., p. 176.
[16] Appendix Exhibit C-49, pp. S-8, Note 1. Wundies, Inc. was sold to a corporation created for the purpose of purchasing its assets. The purchasing corporation Wundies Acquisition, Inc. transferred assets to a new corporation, formed on January 28, 1985. The new corporation was called Wundies Industries, Inc.
[17] Appendix Exhibit C-23. It appears from the discovery of assets of the Panex Liquidating Trust, that the Trust also acquired assets during its existence. On July 14, 1987, the Trust received the final payment of the mortgage for the Andrex facility owned by Duplan in the amount of $1,156,065.26. The Andrex facility which was located in Zebulon, North Carolina, was sold on September 10, 1979.
[18] Appendix Exhibit C-21, Lazare Dep., pp. 96-97.
[19] Appendix Exhibit C-20.
[20] Distributions to Gal-Lazare are reflected in Appendix Exhibits C-8, 9, and 18. On August 15, 1985, Gal and family and Lazare and family transferred their stock into the "street name" of Neuberger and Berman. The amounts of the Third Liquidating distribution and Trust distribution for Gal and family and Lazare and family were calculated by multiplying the amounts distributed by the number of shares they transferred to Neuberger and Berman. See Appendix Exhibit C-11, 12, 13, 14, 14A and 15. Distributions to Firmanco and First Manhattan Co., are reflected in Appendix Exhibits C-7, 10, 17 and 22. Distributions to Goldman Sachs & Co. are reflected in Appendix Exhibits 8, 9, 18 and 22.
[21] Appendix Exhibit C-37.
[22] Appendix Exhibit C-36. Shea and Gould was also counsel to the Trustees and on February 9, 1989 informed the Trustee's accountants of the DEC's claim. See Appendix Exhibit C-35. Though the DEC notice was sent to 477 Madison Avenue, New York, the old address of Panex Industries, Inc., the Trust had moved its location to 437 Madison Avenue (Appendix Exhibit C-47, page numbered "Laga-TU-05427"), it had not designated an agent for service of process (Rosenbloom Dep., p. 187). The Trustees did not notify the DEC of the Trust's existence because "the Trust was not a party to anything the DEC had to be involved with in my judgment." Rosenbloom Dep., p. 126-126.
[23] Similar representations were made to this Court on behalf of the Laga Defendants in the affidavit submitted in support of the motion to dismiss.
[24] No apportionment has been made of these expenses to reflect amounts for which Panex Co. and Gal and Lazare are individually responsible. Rosenbloom Dep., p. 104. Though Rosenbloom claims apportionment is alleged to be requested in pleadings before the Delaware Court, ¶ 15 and 20 of the Petition for Instruction do not identify Gal and Lazare's interest in Panex and the prayer does not request any apportionment of expenses to either of them. The Trust has never received a demand for indemnification from either Gal or Lazare. Rosenbloom Dep., pp. 96 and 104; Lazare Dep., p. 136. A document is claimed to exist between the Trustees and Rosenman & Colin relating to the apportionment issue but Rosenbloom refused to produce it. Rosenbloom claims the alleged document is covered by the attorney/client privilege. Rosenbloom Dep., pp. 53-56.
[25] The Laga Defendants explain that at the time the Four Winds settlement was negotiated in January and at the time the settlement agreement was signed in late April, the Laga Defendants intended to pay the $890,000 settlement figure to the Four Winds plaintiffs from the then assets of the Trust. The Laga Defendants claim that payment of the settlement was subject to their efforts to recover such payments from one or more of its insurance carriers. According to the Laga Defendants, it was their belief that one or more of their insurance carriers would participate in paying the settlement or, at the very least, would provide a defense to the Laga Defendants and would reimburse the Trust for defense costs theretofore paid by the Trust, thereby refilling the coffers of the Trust. Laga Appendix, Exhibit I, p. 18; Exhibit J, pp. 5-7; Movants' Exhibit A, pp. 158-164; Movants' Exhibit D, pp. 99, 107-108.

The Laga Defendants state that in November 1993, the Employers Insurance Company of Wausau ("Wausau"), which had written comprehensive liability insurance policies for Duplan from 1959 through 1976, entered into a written agreement to pay past and future reasonable and necessary defense costs in the Four Winds and PID/Harthman actions and in the related United States Environmental Protection Agency proceeding regarding the Tutu Wells aquifer. Laga Appendix, Exhibit K; Movants' Exhibit D, p. 130. At the time of the Four Winds settlement negotiations in December 1993 and early January 1994, the Laga Defendants claim that Wausau had also agreed that it would "participate" in the settlement. Laga Appendix, Exhibits I; Exhibit J, pp. 3-7. Indeed, the Laga Defendants aver that, at that time, they were also hopeful of reaching an agreement whereby the other comprehensive liability insurers, CNA Insurance Companies and Continental Casualty Insurance Company (collectively "CNA") and Hartford Accident Indemnity Company ("Hartford"), would participate in the Four Winds settlement. Laga Appendix, Exhibit J, pp. 5-7. The Laga Defendants contend that CNA and Hartford had been duly notified of the settlement negotiations and they had not objected to the proposed settlement. Id.; Laga Appendix, Exhibit L. Laga claims that Wausau reneged on its commitment to participate in the Four Winds settlement and as of the end of May, Hartford and CNA had not paid a penny towards either defense costs or the settlement. Movants' Exhibit A, p. 60; Laga Appendix Exhibit W.
Based on the foregoing, the Laga Defendants state they were compelled to make a motion on May 23, 1994 for leave to file a third-party complaint (Laga Appendix, Exhibit W) against its insurers  a motion which was granted by this Court on June 6, 1994. The motion was supported by the affidavit of Joel W. Sternman. Laga Appendix, Exhibit J.
The Laga Defendants point out that on May 25, 1994 the State of New York filed the Western District Action against Panex, the Trust, the two Trustees and various other defendants for response costs associated with a contaminated landfill in Wellsville, New York. On June 7, 1994, one of the Trustees of the Trust was served with a summons and complaint in that action. Laga Appendix, Exhibit E.
Around June 10, an Assistant Attorney General for the State of New York informed the Trust's attorneys that the State took the position that no assets of the Trust could be paid for anything, including attorneys' fees, until the Trustees developed a plan for the ratable allocation of the Trust's assets acceptable to United States District Court Judge John T. Elfvin  the judge presiding in the Western District Action. The suggestion made was that unless the Trust and Trustees stipulated to freeze the Trust's assets, New York State would promptly move for a preliminary injunction to freeze the Trust's assets. See Movants' Exhibit B, pp. 55-56; Laga Appendix, Exhibit HH, p. 9-10. New York State filed a Motion for a Preliminary Injunction on June 28, 1994.
[26] Appendix Exhibit C-25, page 3.
[27] See Rosenbloom Dep., pp. 109-114. Trustee Lazare refused to disclose whether a legal opinion has been requested on this issue. Lazare Dep., pp. 181-184.
[28] This court looking to the Restatement (Second) of Trusts (which constitutes Virgin Islands common law) determined that personal jurisdiction over a trust and its trustee may be obtained even where the trustee does not state affirmatively that the actions taken in the litigation is in his capacity as trustee. See Tutu Wells Litigation II, 157 F.R.D. at 375.